The **COMMUNIST PARTY OF The UNITED STATES** of America, Appellant,

v.

**UNITED STATES** of America, Appellee.

No. 17583.

United States Court of Appeals District of Columbia Circuit.

Argued June 25, 1963.

Decided Dec. 17, 1963.

Petition for Rehearing En Banc Denied Feb. 21, 1964.

Petition for Rehearing by the Division Denied Feb. 21, 1964.

Messrs. John J. Abt, New York City, of the Court of Appeals of New York, pro hac vice, by special leave of court, and Joseph Forer, Washington, D. C., for appellant.

Mr. George B. Searls, Atty., Dept. of Justice, with whom Mr. Kevin T. Maroney and Mrs. Lee B. Anderson, Attys., Dept. of Justice, were on the brief, for appellee.

Mr. O. John Rogge, New York City, filed a brief on behalf of American Civil Liberties Union, as amicus curiae.

Before BAZELON, Chief Judge, and WASHINGTON and McGOWAN, Circuit Judges.

BAZELON, Chief Judge.

The Communist Party of the United States of America appeals its conviction under § 7 and § 15 of the Subversive Activities Control Act [1] for failure to comply with an order of the Subversive Activities Control Board. That order, entered in proceedings commenced some thirteen years ago, found the Party to be a Communist-action organization within the meaning of § 3(3) of the Act and required it to register and submit information under § 7 of the Act. The Supreme Court sustained the order. Communist Party v. Subversive Activities Control Board, 367 U.S. 1, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961).[2] The questions before us concern its enforcement.

The Act requires each organization found by the Board to be a Communist-action organization to register as such with the Attorney General [§ 7(a)], and file an accompanying statement [§ 7(d)] containing its name and the address of its principal office, the names of its officers and members during the preceding year (together with their aliases), an account of money received and spent during the preceding year (including sources

1. Title I of the Internal Security Act of Sept. 23, 1950, 64 Stat. 987, 50 U.S.C. § 781 et seq. (1958).

2. The full course of the litigation may be traced through the following citations: 96 F.Supp. 47 (D.D.C.1951) (three-judge court); 96 U.S.App.D.C. 66, 223 F.2d 531 (1954); 351 U.S. 115, 76 S.Ct. 663, 100 L.Ed. 1003 (1956); 102 U.S.App. D.C. 395, 254 F.2d 314 (1958); 107 U.S. App.D.C. 279, 277 F.2d 78 (1959); 367 U.S. 1, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961).

and purposes), and a list of the organization's printing presses. Both the registration and the statement must be completed on forms prescribed by the Attorney General; by present regulation, 28 C.F.R. §§ 11.200–11.207, these forms are IS–51a (registration) and IS–51 (information). Also by regulation, the completed forms must be signed, either by an officer of the organization, or by a "member, employee, attorney, agent, or other person." If a non-officer signs, he must certify that the organization authorized him to complete and submit the forms.[3] Failure to register or file the statement within thirty days after the order becomes final [§ 7(c) (3)] subjects the organization to a fine of up to $10,000 [§ 15(a) (1)], with each day of failure to register counting as a separate offense [§ 15(a)].

After the Board's order in this case became final upon entry of the Supreme Court's mandate on October 20, 1961, the Party had until November 19 to register without penalty. Before then, the Attorney General received a letter on Party stationery, dated November 10 and signed only with the Party seal, stating that the Party's officers declined, for fear of self-incrimination, to submit the forms or to authorize anyone to submit them:

> These declinations are made by each officer in the exercise of his privilege under the Fifth Amendment to the Constitution not to be a witness against himself. The officers have adopted this means of asserting their respective constitutional privileges because a claim of privilege made in the name of an officer would tend to incriminate him and

might constitute a waiver of his privilege.

The Attorney General replied by telegram on November 17, rejecting the claims of privilege contained in the Party's letter and also rejecting the letter as compliance with the order to register. The Party took no further action.

On December 1, the indictment herein was returned. It charged the Party with eleven counts of failing to register (one for each day between November 20 and November 30), and one count of failing to file the statement. At trial, the Party's failure to register and to file the statement was stipulated. The Government called only one witness. He testified that he had attended a press conference on June 8, 1961 (immediately after the Supreme Court's decision) at which Gus Hall announced the Party's intention not to comply.[4] The Party called no witnesses. Before trial the Party moved to dismiss the indictment, and at the end of the trial it moved for a judgment of acquittal. In both these motions the Party argued, *inter alia*, that its failure to comply was legally justified because the regulations accompanying § 7 require the registration and information forms to be signed by a natural person, and under Patricia Blau v. United States, 340 U.S. 159, 71 S.Ct. 223, 95 L.Ed. 170 (1950), anyone who signed would be admitting an incriminating association. Thus, argued the Party, unless someone were willing to incriminate himself, there was no way in which the Party could register. The Government responded that the officers had a duty to sign for the Party and could not claim the privilege as legal justification for avoiding this duty, and that even if they could,

3. When the 1961 Communist Party case was decided, and until October 7, 1961, a single form, ISA–1, was prescribed for both registration and information. This form required the signatures of all "partners, officers, and directors, including the members of the governing body of the organization." It did not include the alternative of signing by an "other person."

4. Seated with Gus Hall at the press conference were Benjamin Davis and Elizabeth Gurley Flynn. Although the Government alleges that all three occupy positions of leadership in the Party as a matter of "common knowledge," there is nothing in the record to indicate their status other than the tenor of Gus Hall's remarks and testimony that the press conference took place at Communist Party headquarters.

the Party was not relieved of its duty to register but must get someone else to sign the forms on its behalf.

The motions to dismiss and for acquittal were denied. The jury was instructed that no issue of self-incrimination was before it, the critical question being whether the Party's failure to comply was intentional rather than accidental or inadvertent. A verdict of guilty was returned on all twelve counts. The court imposed the maximum sentence, fines totaling $120,000, and the Party brought this appeal. We disagree with the trial court's disposition of the self-incrimination issues.[5]

 The regulations accompanying § 7 of the Act imposed a duty upon the Party to file certain forms signed by a natural person. To sustain a criminal charge for failure to comply, it must appear that someone was available who was either legally bound or willing to sign. Ordinarily, proof of this essential element may be supplied by presumptions that (1) an organization's legal obligation devolves upon its officers, whose failure to execute the obligation makes the organization liable; and (2) if an officer has legal justification for refusing to act, the organization can provide someone else who will act for it. The question before us is whether these presumptions apply in the circumstances of this case.

This problem must be viewed against the background of American history during the past generation. That history shows that the Communist Party does not stand before the law as an ordinary political group. The Party's special status does not arise from the unpopularity of its views, or the public opprobrium attaching to it and its adherents. See Communist Party v. Subversive Activities Control Board, 367 U.S. at 102–103, 81 S.Ct. at 1413, 6 L.Ed.2d 625. Instead, it arises from the imposition of governmental sanctions upon the Party and its members, based on a special danger to our national security. On that ground, statutes have been sustained which might otherwise have raised serious constitutional objections. See American Communications Ass'n v. Douds, 339 U.S. 382, 70 S.Ct. 674, 94 L.Ed. 925 (1950); Carlson v. Landon, 342 U.S. 524, 72 S.Ct. 525, 96 L.Ed. 547 (1952); Galvan v. Press, 347 U.S. 522, 74 S.Ct. 737, 98 L.Ed. 911 (1954); Communist Party v. Subversive Activities Control Board, 367 U.S. at 104–105, 81 S.Ct. at 1414, 6 L.Ed.2d 625; Scales v. United States, 367 U.S. 203, 224–228, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961); Barenblatt v. United States, 360 U.S. 109, 128, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959). See also American Communications Ass'n v. Douds, supra 339 U.S. at 422, 70 S.Ct. at 696, 94 L.Ed. 925 (opinion of Jackson, J.) Civil disabilities imposed on adherents of the Communist movement include prohibitions on entering the United States,[6] denial of Social Security benefits,[7] and ineligibility for many forms of employment.[8]

Most critical for present purposes are the criminal sanctions. Since 1940, the

5. In the 1961 *Communist Party* case, the Party argued that its inability to register unless someone incriminated himself by signing the prescribed registration forms made the Act unconstitutional. But the Supreme Court refused to consider any self-incrimination issues until there was an actual claim of the privilege. And, the Court added, if no claim was made because of fear that a claimant would incriminate himself merely by revealing his identity, the issue would be reached if and when the Party raised it to avoid concrete legal harm, "when enforcement proceedings for failure to reg-

ister are instituted against the Party." 367 U.S. at 109, 81 S.Ct. at 1417, 6 L.Ed. 2d 625. Accordingly, the issues raised by the signature requirement of Forms IS–51 and IS–51a are now ripe.

6. See, *e. g.*, Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953).

7. See, *e. g.*, Flemming v. Nestor, 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960).

8. See, *e. g.*, Adler v. Board of Education, 342 U.S. 485, 72 S.Ct. 380, 96 L.Ed. 517 (1952).

Smith Act has threatened with fine and imprisonment anyone who:

> "organizes or helps or attempts to organize any society, group, or assembly of persons who teach, advocate, or encourage the overthrow or destruction of any [government in the United States] by force or violence; or becomes or is a member of, or affiliates with, any such society, group, or assembly of persons, knowing the purposes thereof." [18 U.S.C. § 2385] [9]

And with the successful application of the membership clause in Scales v. United States, supra, it is not necessary to prove that a defendant himself has taught, advocated, or encouraged the overthrow or destruction of a government by force or violence. It must be shown that the organization advocates the overthrow, see Noto v. United States, 367 U.S. 290, 81 S.Ct. 1517, 6 L.Ed.2d 836 (1961), but with respect to the Communist Party, Congress has supplied this showing. The Communist Control Act of 1954 declares:

> Sec. 2. "The Congress finds and declares that the Communist Party of the United States, although purportedly a political party, is in fact an instrumentality of a conspiracy to overthrow the Government of the United States. * * * Therefore, the Communist Party should be outlawed. [50 U.S.C. § 841]

And the Act proceeds:

> Sec. 3. "The Communist Party of the United States * * * [is] not entitled to any of the rights, privileges, and immunities attendant upon legal bodies created under the jurisdiction of the laws of the Unit-

ed States or any political subdivision thereof." [50 U.S.C. § 842]

The conclusion is inescapable that the Communist Party is sui generis. The legislative array facing the Party virtually makes it a criminal conspiracy per se. Confirmation of this status is contained in a series of Supreme Court cases holding that mere association with the Communist Party presents sufficient threat of criminal prosecution to support a claim of the privilege against self-incrimination. Patricia Blau v. United States, 340 U.S. 159, 71 S.Ct. 223, 95 L.Ed. 170 (1950) (employment by the Party or "intimate knowledge of its workings"); Irving Blau v. United States, 340 U.S. 332, 71 S.Ct. 301, 95 L.Ed. 306 (1951); Brunner v. United States, 343 U.S. 918, 72 S.Ct. 674, 96 L.Ed. 1332 (1952) (attendance at Party meetings); Quinn v. United States, 349 U.S. 155, 75 S.Ct. 668, 99 L.Ed. 964 (1955) (membership). It is against this background that we consider whether an officer or non-officer was available to sign the forms on behalf of the Party.

■ By assuming office in an organization one does not waive his privilege against self-incrimination, even in matters closely related to the organization's affairs. Curcio v. United States, 354 U.S. 118, 77 S.Ct. 1145, 1 L.Ed.2d 1225 (1957). The privilege may be unavailable where the officer's representative duties are involved. Thus, under the "required records" doctrine, an officer may not refuse to produce books and records *belonging to the organization* on the ground that the contents will incriminate *him*. United States v. Wilson, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771 (1911); United States v. White, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944). But in those cases, in sharp contrast to

9. Compare § 4(a) of the Subversive Activities Control Act:
 "It shall be unlawful for any person knowingly to combine, conspire, or agree with any other person to perform any act which would substantially contribute to the establishment within the United States of a totalitarian dictatorship * * * the direction and control of which is to be vested in, or exercised by or under the domination or control of, any foreign government, foreign organization, or foreign individual * * *." 50 U.S.C. § 783(a).

the present case, the mere act of producing the records was not incriminating. *Wilson* and *White* furnish no authority for compelling an officer to identify himself as such where, as here, such identification, without more, incriminates him.

■ Other cases indicate strongly that when the mere act of producing information is incriminating, the privilege is available even if it makes the information unavailable. Thus, although an officer who produces books and records may be required to supply "auxiliary information," such as authentication of the items produced, United States v. Austin-Bagley Corp., 31 F.2d 229 (2d Cir. 1929), this doctrine is sharply limited to information which creates no danger of incrimination. Curcio v. United States, *supra*; see Arndstein v. McCarthy, 254 U.S. 71, 41 S.Ct. 26, 65 L.Ed. 138 (1920). And this is true even where the officer is asked only to describe the contents of books which he was bound to produce but which were lost or stolen. United States v. Daisart Sportswear, Inc., 169 F.2d 856 (2d Cir. 1948). In Rogers v. United States, 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344 (1951), a district court held an officer of the Communist Party in contempt for refusing to produce books and records of the Party subpoenaed by a grand jury. The officer had testified before the grand jury that she had given the books and records to someone else but refused to say to whom, on the ground that she would incriminate herself by "mere disclosure of the name of the recipient of the books." Although the Supreme Court sustained the conviction, its opinion makes clear that the claim of privilege would have been upheld except that the officer had waived her privilege by testifying earlier in the same proceeding to her "membership, activities and office in the Party."

■ Russell v. United States, 306 F.2d 402 (9th Cir. 1962), held that a statute requiring registration of firearms whose possession violated certain other criminal provisions compelled incriminating admissions and was thus an unconstitutional infringement of the fifth amendment privilege. Here, just as in *Russell*, "the act of registering is necessarily incriminating whether or not any information other than the registrant's name is supplied * * *." 306 F.2d at 410 n. 16. See also United States v. Lombardo, 228 F. 980 (W.D.Wash.1915), aff'd on other grounds, 241 U.S. 73, 36 S.Ct. 508, 60 L.Ed. 897 (1916). We hold that the privilege against self-incrimination was available to the officers as legal justification for refusing to sign forms IS–51 and IS–51a.[10] Since the officers could not identify themselves in claiming the privilege without surrendering its protection, see Russell v. United States, *supra*, the November 10 letter was a sufficient assertion of their claim.[11] It

---

10. Section 4(f) of the Subversive Activities Control Act, the immunity provision, is inadequate since it prevents only introduction of the fact of registration into evidence at a criminal trial and does not prevent the Government from using knowledge gained from registration to acquire evidence which can be introduced. Counselman v. Hitchcock, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110 (1892). Compare the immunity granted witnesses before the Board by the last sentence of § 13(c). Cf. Scales v. United States, 367 U.S. at 206–219, especially 219, 81 S.Ct. at 1481, 6 L.Ed.2d 782.

11. We need not decide whether the Communist Party has standing to "assert the [privilege] of its officers," see Communist Party v. Subversive Activities Control Board, 367 U.S. at 184–188, 81 S.Ct. at 1456–1458, 6 L.Ed.2d 625 (Douglas, J., dissenting). The problem would arise only if the Party sought to justify its conduct by reference to a privilege available to the officers but not claimed by them. Such a situation was before the Supreme Court in the 1961 *Communist Party* case, and would be before us if the Party were refusing to submit membership lists on the ground that the members would be incriminated. In this case, the Party did two things, which may not be added together to form an "assertion of the officers' privilege." It relied on the officers' refusal to sign, which they justified by asserting their own privilege, and it communicated notice of their assertion by sending the letter of November 10.

follows that the jury should have been instructed that the officers were privileged not to sign and that no liability attached to the Party by reason of their refusal.

■ This does not exhaust the Party's responsibility. The regulations permit the forms to be signed by a "member, employee, attorney, agent, or other person." And it has been held in cases involving the duty of an organization to provide information that if the person selected by the organization to act on its behalf claims the privilege against self-incrimination, it must select someone else who can act without incriminating himself:

> "It will thus be the clear duty of the corporation to select an officer or agent for the above purpose, who will not have personally participated in anywise in any such questionable transaction, and who thus cannot be incriminated by such answers. This the corporation can easily do under its broad corporate powers, using even its attorney, for instance, whose duty it would then be to "furnish such information as is available to the party."

United States v. 42 Jars, 162 F.Supp. 944, 946 (D.N.J.1958), affirmed, 264 F.2d 666 (3d Cir. 1959). See also United States v. 3963 Bottles, 265 F.2d 332 (7th Cir. 1959); Simon v. American Tobacco Corp., 192 F. 662 (S.D.N.Y.1912). These cases seem to support a legal presumption that an organization can always find someone willing, even if not legally bound, to act for it. But we think no such presumption can fairly be applied to the Communist Party. Since mere association with the Party incriminates,

we cannot assume without proof that anyone is willing to submit data the possession of which implies an "intimate knowledge of [the Party's] workings." Whether or not such a volunteer was available is a question of fact which requires proof.

■ We must therefore consider who has the burden of such proof. Ordinarily the government must prove beyond a reasonable doubt each element of the offense charged. But where the pertinent information is much more readily available to the defendant than to the government, the burden may be shifted to him, provided this can be done "without subjecting the accused to hardship or oppression." Morrison v. California, 291 U.S. 82, 87–89, 54 S.Ct. 281, 284, 78 L.Ed. 664 (1934). The proviso is required to safeguard the presumption of innocence. In the present case, we assume that the Party would be more likely than the government to know whether a willing volunteer was available.[12] But to place the burden of proof on the Party would require it to prove, at the very least, that some person made reasonable efforts on its behalf to find a volunteer, and that such efforts failed. It is unlikely that the Party could make this proof unless someone waived his privilege and testified to his efforts on behalf of the Party in seeking a signer. If the burden were placed on the Party, unless someone waived his privilege the issue would be resolved against the Party by default. Thus the Party would be under duress to induce someone to waive. This is the sort of "hardship or oppression" to which the defendant in a criminal case should not be subjected.[13] Therefore the burden of proving that a willing volunteer was not available may not be as-

---

12. Yet a volunteer not intimately associated with the Party might perhaps make his availability known to the government.

13. In Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), a statute provided that government allegations in forfeiture proceedings were to be taken as proved if a claimant refused to produce documents which the government said would tend to prove its allegations. The Supreme Court held that forcing a claimant to give up documents which might well be incriminating, in order to refute government allegations which would result in loss of his property, was unconstitutional because it put pressure on the claimant to waive his privilege.

signed to the Party. The burden of proving that a volunteer *was* available remains with the government.[14]

The government presented no evidence that a volunteer was available. Gus Hall's statement that the Party would not comply with the Act and the Party's letter saying the officers refused to authorize anyone to execute the forms, tended to establish only that the Party did not wish to comply and did not try to get someone to act on its behalf. Where, as here, an element of the offense requires proof that the defendant could have complied, it is not established merely by proof that the defendant had no intention of complying.

In Heikkinen v. United States, 355 U.S. 273, 78 S.Ct. 299, 2 L.Ed.2d 264 (1958), an alien had been convicted under § 20(c) of the Immigration Act of 1917 of willfully failing to depart the United States within six months after he was ordered deported.[15] He could not depart unless another country would accept his application for admission. The government showed that the alien made no such application but did not show that any country would have admitted him. The Supreme Court reversed the conviction for lack of evidence, saying "[t]here can be no willful failure to depart until 'the country willing to receive the alien is identified.'" So here, there can be no willful failure of the Party to register until it is shown that someone was willing to sign on its behalf.[16]

We do not hold that an organization may claim the privilege against self-incrimination, nor that an individual may claim the privilege on behalf of an organization or its members. We express no opinion concerning the Communist Party's duty to submit the data demanded. We hold only that the availability of someone to sign the forms was an element of the offense; that the officers, who should otherwise have signed, were unavailable by reason of their valid claim of the privilege against self-incrimination; that the government had the burden of showing that a volunteer was available; and that its failure to discharge this burden requires reversal of the conviction. Because the issues are novel, it seems "just under the circumstances," 28 U.S.C. § 2106, to afford the government an opportunity to present the proof required by our holding. The case is remanded to the District Court "with instructions to grant a new trial if the Government shall request it; or, absent such request, to enter a judgment of acquittal." Wright v. United States, 102 U.S.App.D.C. 36, 250 F.2d 4 (1957). See also Douglas v. United States, 99 U.S.App.D.C. 232, 239 F.2d 52 (1956); Bryan v. United States, 338 U.S. 552, 70 S.Ct. 317, 94 L.Ed. 335 (1950).

So ordered.

14. In United States v. Fleischman, 339 U.S. 349, 70 S.Ct. 739, 94 L.Ed. 906 (1950); and McPhaul v. United States, 364 U.S. 372, 81 S.Ct. 138, 5 L.Ed.2d 136 (1960), the Supreme Court upheld placing on the defendant the burden of showing justification for failure to produce books and records of an organization, but it does not appear in either case that he would have subjected himself to the danger of self-incrimination in discharging his burden.

15. 39 Stat. 890 (1917), as amended, 8 U.S. C. § 1252(e).

16. Although the word "willful" does not appear in § 15, we think willfulness is a necessary element of the crime of failing to register, as the government recognized in the indictment.