The COMMUNIST PARTY OF the UNIT-
ED STATES of America, Appellant,

v.

UNITED STATES of America,
Appellee.

Nos. 19880, 19881.

United States Court of Appeals
District of Columbia Circuit.

Argued May 17, 1966.

Decided March 3, 1967.

Mr. John J. Abt, New York City, of
the bar of the Court of Appeals of New

York, pro hac vice, by special leave of court, with whom Mr. Joseph Forer, Washington, D. C., was on the brief, for appellant.

Mr. Kevin T. Maroney, Atty., Dept. of Justice, with whom Asst. Atty. Gen. J. Walter Yeagley, Messrs. David G. Bress, U. S. Atty., and George B. Searls, Atty., Dept. of Justice, were on the brief, for appellee. Mr. Frank Q. Nebeker, Asst. U. S. Atty. and Mr. Joseph A. Lowther, Asst. U. S. Atty. at the time the record was filed, also entered appearances for appellee.

Before PRETTYMAN, Senior Circuit Judge, and DANAHER and McGOWAN, Circuit Judges.

McGOWAN, Circuit Judge:

These consolidated appeals are from judgments of conviction under two indictments returned, respectively, on December 1, 1961 and February 25, 1965. Each charged appellant, a voluntary association, with eleven counts of failing to register as a Communist-action organization as required by the Subversive Activities Control Act of 1950, and one count of failing to file the statement which Congress directed should accompany the act of registration. 64 Stat. 987–1005, 50 U.S.C. §§ 781–798 (1964). Appellant was convicted on all counts of both indictments,[1] with the exception of the registration statement count of the second indictment which the Government abandoned when forced by the trial court to elect between it and the corresponding count in the first indictment. The maximum punishment of a $10,000 fine in respect of each count was imposed. Because we have concluded that the results of the statutory scheme for the control of appellant, when viewed as a whole in relation to these particular punishments, are hopelessly at odds with the protections afforded by the Fifth Amendment, and that scheme if here applied would particularly run counter to the Fifth Amendment's ban on compelled incrimination, we reverse the convictions.

I

The Board order which appellant is charged with failing to obey was before the United States Supreme Court in Communist Party v. Subversive Activities Control Board, 367 U.S. 1, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961). Challenges of various kinds to its validity were made and, with one exception, explicitly rejected. The exception was one founded upon the Fifth Amendment's self-incrimination clause. The prevailing majority of the Court were of the view that it was premature to resolve the claim that the statute was unconstitutional insofar as it embraced any requirement that the Party's officers or governing members comply with the registration requirements on its behalf. The disposition of this issue, so it was said, could await the time when, if ever, "enforcement proceedings for failure to register are instituted *against the Party* or against its officers." *Id.* at 109, 81 S.Ct. at 1417. (Emphasis supplied). Four members of the Court dissented from this staying of the judicial hand, and, with varying shades of emphasis, expressed doubts as to the invulnerability of the statutory scheme to Fifth Amendment attack.

This was the state of higher authority when appellant's first conviction came before us. We reversed that conviction (Note 1, *supra*) on the ground that (1) the self-incrimination privilege was available to the officers of the Party, (2) that privilege had in fact been adequately asserted, and (3) to the extent registration could, under the regulations, be effected by an "agent" or "other person," conviction must, at the least, rest upon proof

---

1. The existence of two indictments is explained by the fact that an earlier conviction on the first was reversed by this court in Communist Party v. United States, 118 U.S.App.D.C. 61, 331 F.2d 807, cert. denied, 377 U.S. 968, 84 S.Ct. 1646, 12 L.Ed.2d 737 (1964). Before proceeding to try appellant again, the Government sought a second indictment founded upon the same facts as the first, but seeking punishment in respect of continuing violations occurring later in point of time.

of the availability of such a person.[2] We left the constitutional issues unstirred for the most part, stating expressly that we ventured "no opinion concerning the Communist Party's duty to submit the data demanded." 118 U.S.App.D.C. at 69, 331 F.2d at 815.

Since this action on our part, a number of things have happened. One is, of course, that the Government has re-tried appellant, and a second conviction is before us on this appeal. Another is that the Supreme Court has addressed itself further to certain aspects of the Subversive Activities Control Act.[3] The most significant of these later adjudications for present purposes is Albert-son v. Subversive Activities Control Board, 382 U.S. 70, 86 S.Ct. 194, 15 L. Ed.2d 165 (1965). In that case the Court made short shrift of our emulation of its restraint in dealing with the self-incrimination claim in the earlier *Communist Party* case; and, without awaiting a tender of the issue in criminal enforcement proceedings, invalidated under the Fifth Amendment a Board order requiring, in default of registration by the Party and as commanded by the Act, registration by persons found to be members of the Party. Although *Albertson* exhibits the self-incrimination issue in a somewhat different posture from that involved in this appeal, both the mode and the manner of

2. The Act affirmatively requires a Communist-action organization to register as such, and to accompany the registration with a registration statement containing certain information spelled out in the statute. The Attorney General is, however, given the power to prescribe by regulation the form to be used in each instance. The regulations first issued under the Act prescribed a single form which was to be signed by an officer or member of the governing body of the organization. After *Communist Party* was decided by the Supreme Court, the regulations were amended so as to provide separate forms for registration, on the one hand, and for the accompanying registration statement, on the other. See 28 C.F.R. §§ 11.200–11.201 (1966). Under the amended instructions, neither was required to be signed by an officer, but could be signed instead by a "member, employee, attorney, agent, or other person filing the registration statement * * * [who] shall certify in writing that he has been authorized by the Communist organization to file the registration statement on its behalf." Form IS–51a, issued under regulations *supra.*

3. In Aptheker v. Secretary of State, 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964), the Supreme Court, on due process grounds, invalidated Section 6 of the Act, which made it unlawful for any member of a Communist organization required to register to apply for or use a passport. See also Mayer v. Rusk, 378 U.S. 579, 84 S.Ct. 1909, 12 L.Ed.2d 1035 (1964). More recently the Court remanded to the Board, because of the staleness of the records made in the administrative proceedings, two orders re-

quiring Communist-front organizations to register. American Committee for Protection of Foreign Born v. SACB, 380 U.S. 503, 85 S.Ct. 1148, 14 L.Ed.2d 39 (1965); Veterans of the Abraham Lincoln Brigade v. SACB, 380 U.S. 513, 85 S.Ct. 1153, 14 L.Ed.2d 46 (1965). In each case Justices Douglas, Black, and Harlan were of the view that the constitutional issues should, without remand, be faced and decided as long overdue. It is also of interest to note United States v. Brown, 381 U.S. 437, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965), in which the Court struck down, as a bill of attainder, Section 504 of the Labor-Management Reporting and Disclosure Act of 1959, which made it a crime for a member of the Communist Party to serve as an officer or employee of a labor union—a disqualification which, as the dissent pointed out, is almost exactly the same as that prescribed in Section 5(a) (1) (E) of the Subversive Activities Control Act. 381 U.S. at 470, 85 S.Ct. 1707. The Government has recently told the Court that it need not even address itself to the legality of the provision in the so-called medicare statute whihc denies benefits to individuals who are members of organizations required to register under the Subversive Activities Control Act. This provision was, on November 14, 1966, held unconstitutional by a three-judge District Court in the Central District of California (Reed v. Gardner, D. C., 261 F.Supp. 87); and the Government has decided not to appeal in the face of Elfbrandt v. Russell, 384 U.S. 11, 86 S. Ct. 1238, 16 L.Ed.2d 321 (1966). Cf. Appellee's Suggestion of Mootness, Weiss v. Gardner, judgment vacated, 386 U.S. 9, 87 S.Ct. 861, (February 14, 1967).

the Court's decisive intervention to vindicate the privilege in that case suggest that it is in order for us to come to grips with the issue deferred by it in the *Communist Party* case, that is to say, the essential question of whether, because of its impact on the Party membership, the weapon of compelled disclosure can, consistently with the Fifth Amendment, be trained upon appellant.

### III

The Supreme Court's decision in *Communist Party* presumably retains enough vitality to suggest that there is very much indeed that Congress may do in the pursuit of a single purpose to regulate the Communist Party by the device of disclosure. The difficulty is that the purposes of Congress in respect of the Communist Party have not been single in nature. They have, rather, sought in effect to compel both disclosure by the Party and, at the same time, the incrimination of its members. The Congressional enactments applicable to the Communist Party have, severally but simultaneously, exposed it in substance to outlawry as well as to an obligation to disclose its records and affairs. We may assume for the moment that either approach was, and is, constitutionally feasible. We can not, because of the Fifth Amendment, safely assume as much in the case of the co-existence of both purposes.

In *Albertson*, the Court noted (382 U. S. at 79, 86 S.Ct. at 199) that the self-incrimination claims there made were "not asserted in an essentially non-criminal and regulatory area of inquiry, but against an inquiry in an area permeated with criminal statutes, where response to any of the form's questions in context

might involve the petitioners in the admission of a crucial element of a crime." Earlier in that opinion (at 77, 86 S.Ct. at 198) the Court had identified the membership clause of the Smith Act, 18 U.S.C. § 2385 (1964), and Section 4(a) of the Subversive Activities Control Act as "only two federal criminal statutes" it might mention as exposing members of the Party to prosecution. The Court coincidentally characterized itself as having already held that, short of membership, "mere association with the Communist Party presents sufficient threat of prosecution to support a claim of privilege." *Ibid.* Also in *Albertson*, the Court confirmed the conclusion reached by us in appellant's appeal from its first conviction that the immunity provision contained in Section 4(f) of the Act falls short of the dimensions necessary to blunt the Fifth Amendment claim.

An aspect of *Albertson* not least in significance is the concurring opinion of Mr. Justice Clark, one of those who voted to defer the Fifth Amendment issue in the review proceeding of 1961. He noted (at 85, 86 S.Ct. at 202) that the invalidation effected in *Albertson* had been "forecast in 1948" in a letter by him as Attorney General to the Senate Judiciary Committee, responding to a request for the views of the Department of Justice on one of the bills which led to the eventual passage of the Act. That letter voiced the opinion that "the measure might be held (notwithstanding the legislative finding of clear and present danger) to deny freedom of speech, of the press, and of assembly, and even to compel self-incrimination. *Cf.* United States v. White (322 U.S. 694 [, 64 S.Ct. 1248, 88 L.Ed. 1542])." [4]

4. *Hearings on H.R. 5852 before the Senate Committee on the Judiciary,* 80th Cong., 2d Sess. 423–24 (1948). The significance of the Attorney General's reference to *White* lies in this: The bill to which his comments were addressed, H.R. 5852, was introduced in the 80th Congress and known as the Mundt-Nixon bill. Unlike the later bills and the Act as it finally emerged, H.R. 5852 required only

the registration of organizations, as distinct from their members. The Attorney General must, therefore, be taken as expressing a constitutional doubt, deriving from the self-incrimination privilege, even where associations alone are involved. His reference to *White*, a case which we discuss in detail hereinafter, suggested his awareness that a differentiation might perhaps be made between organizations

Attorney General Clark, as he then was, was far from alone in his fear that Congress was following a dual approach to the Communist Party which might well be self-defeating. A bill which started out as an effort to treat the Party like other political parties in terms of disclosure ended up as legislation which singled the Party out for subjection to the combined sanctions of compelled disclosure and criminal punishment. As this duality began to take shape more clearly, more and more voices in Congress were raised in warning that irreconcilable goals were being sought; and that, to the extent that publicity for the Communist Party and disclosure of its affairs for all to see was the paramount Congressional objective, it was being jeopardized by parallel efforts to put the Communist Party and its members under the restraints of the criminal law.[5] In floor debate, Senator Humphrey referred to "the testimony of noted lawyers, such as Charles Evans Hughes, Jr., and John W. Davis, who have doubts as to its constitutionality. They believe that it may be in violation of the Fifth Amendment, which provides that a man shall not be required to testify against himself." 96 CONG.REC. 14487 (1950). Several other Senators voiced Fifth Amendment objections, noting the interplay between the disclosure requirements, on the one hand, and the substantive prohibitions of the bill plus the already enacted Smith Act, on the other. E. g., S.REP.No.2369, 81st Cong., 2d Sess. 12–13 (1950) (Minority Views). Senator Lehman observed that "registration would constitute self-incrimination, if not under the terms of this law, then under the terms of the Smith Act"; and

that to require in the same bill the registration of Communists and their jailing for being Communists was "a parody on legislation." 96 CONG.REC. 14190, 15694 (1950). President Truman, although addressing his veto message largely to the practical futility of the measure, captured the essence of the legal objection in his characterization of the final product as tantamount to "requiring thieves to register with the sheriff." 96 CONG.REC. 15630 (1950).

Quite apart from the impact of other provisions of the 1950 legislation upon the registration requirements, there was the problem of the Smith Act, which had become law in 1948. On the same day the Supreme Court upheld the Board's order as against every attack except that of self-incrimination, it also affirmed the criminal conviction of a Communist Party member under the so-called membership clause of the Smith Act. Scales v. United States, 367 U.S. 203, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961). With this decision, any doubts about the constitutionality of the Smith Act in its fullest reach—and there had been many, both before and after its enactment—were set at rest, with the most ominous criminal implications for the Communist Party and all those associated in any way with it. Such chance of constitutional survival as the disclosure approach to regulation of the Communist Party may have theretofore had perhaps foundered upon the reef of Scales.

█ Congress's very success with its direct assault upon the Communist Party through the sterner medium of the criminal law could only have had the effect of undermining the constitutional

and individuals in the availability of the privilege. But apparently *White* did not lay his doubts to rest.

5. The Attorney General's letter just referred to noted this intermingling, which was the source of his Fifth Amendment doubts, in these terms:

The bill represents two distinct statutory efforts—one directed to the prohibition and punishment of subversive activities as such, and the other a reg-

istration statute calculated to effect disclosure of the identity and propaganda of individual Communists and Communist organizations. Within this framework there have also been incorporated certain other regulatory provisions relating to the general problem. The subversive activities and registration sections of the bill cannot, from a legal standpoint, be separate, but must be judged as a whole.

*Id.* at 423.

foundations of its disclosure approach. So long as the self-incrimination clause of the Fifth Amendment endures, activity may be made criminal, but the actor cannot be compelled to characterize it as such and to disclose it.[6] If Congress would do the one, it may have to forego the other. The choice by Congress of the means it believes more effective remains with it.

### IV

It may be questioned whether appellant is helped even if these premises are accepted as true and the result in *Albertson* embraced as a necessary consequence of them. If the self-incrimination privilege is personal in the sense of not being available to corporations and associations, how may appellant—a self-describ- ed voluntary association—interpose the privilege as a shield against criminal prosecution of itself for failing to make the disclosures required by the Act? This question is highly pertinent and not easy of resolution. We think, however, that it rests upon premises formulated in respect of circumstances vastly different from those involved here—so much so, indeed, that the policies they serve are mostly irrelevant to the issues which must be faced in the present context.

■■ The doctrine that corporations and associations have no privilege has largely been enunciated in cases where an individual was sought to be criminally punished for refusing to produce records belonging to the entity and kept in the course of its business.[7] It was

6. Although Lewis v. United States, 348 U.S. 419, 75 S.Ct. 415, 99 L.Ed. 475 (1955), and United States v. Kahriger, 345 U.S. 22, 73 S.Ct. 510, 97 L.Ed. 754 (1953), concerned the constitutionality of a federal wagering tax which required those subject to it to register with the taxing authorities despite the illegality of such an occupation under the laws of the jurisdictions where the cases arose, the grounds offered in support of the sustaining of the gambling tax in those cases are not relevant here. The Court there found that registration was only a condition to wagering in the future and hence did not require confessing to any criminal acts that had theretofore been committed. It is worthy of note that in an array of cases, amongst them Costello v. United States, 352 F.2d 848 (2d Cir. 1965), cert. granted 383 U.S. 942, 86 S.Ct. 1195, 16 L.Ed.2d 205 (1966), the Supreme Court has accepted for review the question: "Do not the Federal wagering tax statutes here involved violate the petitioner's privilege against self-incrimination guaranteed by the Fifth Amendment? Should not this court, especially in view of its recent decision in Albertson v. Subversive Activities Control Board * * * overrule United States v. Kahriger * * * and Lewis v. United States * * *?" *Inter alia,* Marchetti v. United States, 385 U.S. 1000, 87 S.Ct. 698, 17 L.Ed.2d 540 (No. 38), Markis v. United States, 387 U.S. 425, 87 S.Ct. 1709, 18 L.Ed.2d 864 (No. 43), summarized (July 5, 1966). See generally Mansfield, *The Albertson Case: Conflict Between the Privilege Against*

*Self-Incrimination and the Government's Need for Information,* 1966 SUPREME COURT REVIEW 103, 151–58 (Kurland ed.).

7. An early such case was Hale v. Henkel, 201 U.S. 43, 66–70, 26 S.Ct. 370, 50 L.Ed. 652 (1906), where it was held that corporate officers must testify as to corporate activities and produce corporate documents before a grand jury investigating Sherman Act violations where such individuals are accorded immunity from subsequent antitrust prosecution. In Wilson v. United States, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771 (1911), the doctrine was extended to require a corporate officer to produce corporate documents even when he pleaded they might incriminate him personally. It has since become settled that officers of corporations cannot escape contempt liability for refusing to produce corporate books and papers on a claim that they contain incriminating information. *E. g.,* Nilva v. United States, 352 U.S. 385, 392, 77 S.Ct. 431, 1 L.Ed.2d 415 (1957); Heike v. United States, 227 U.S. 131, 33 S.Ct. 226, 57 L.Ed. 450 (1913); Dreier v. United States, 221 U.S. 394, 31 S.Ct. 550, 55 L. Ed. 784 (1911). The rule extends, the Court has held, to compelling former corporate officers to produce papers that had passed to them when the corporation was dissolved. Grant v. United States, 227 U.S. 74, 33 S.Ct. 190, 57 L. Ed. 423 (1913); Wheeler v. United States, 226 U.S. 478, 33 S.Ct. 158, 57 L.Ed. 309 (1913). Nonetheless an officer may refuse to give oral testimony as to

thought that to hold that the privilege applied would interfere intolerably with the visitatorial powers of government over artificial entities existing by public sufferance; and it seems clear that effective governmental regulation was regarded as jeopardized by conferring a constitutional cloak of secrecy upon corporate proceedings. If corporations were to be made legal at all, then their internal affairs should be amenable to public scrutiny.[8]

In a contempt prosecution of a labor union official for failing to produce union records before a grand jury, a claim of privilege was similarly unavailing, and for essentially the same reasons. The absence of a privilege assertable by or on behalf of the union, an unincorporated association, was said by the Supreme Court to be dictated by the need to assure effective regulation of "[t]he scope and nature of the economic activities of incorporated and unincorporated organizations". United States v. White, 322 U.S. 694, 700, 64 S.Ct. 1248, 1252, 88 L.Ed. 1542 (1944).[9] As in the case of corpora-

corporate matters if they would personally incriminate him. See Shapiro v. United States, 335 U.S. 1, 27, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948); Wilson v. United States, 221 U.S. 361, 385, 31 S.Ct. 538, 55 L.Ed. 771 (1911).

The doctrine that the privilege is not available to protect corporations from criminal punishment has become almost an article of faith, although the question did not arise as early or as often as did cases concerning orders directed to corporate officers. See, e. g., United States v. Bausch & Lomb Optical Co., 321 U.S. 707, 726–727, 64 S.Ct. 805, 88 L.Ed. 1024 (1943); Essgee Co. v. United States, 262 U.S. 151, 43 S.Ct. 514, 67 L.Ed. 917 (1923); Baltimore & Ohio RR. v. ICC, 221 U.S. 612, 622, 31 S.Ct. 621, 55 L.Ed. 878 (1911); American Lithographic Co. v. Werckmeister, 221 U.S. 603, 611, 31 S.Ct. 676, 55 L.Ed. 873 (1911). A factor in the widespread acceptance of the doctrine is of course that, after denying corporate officers the privilege for reasons relating to the necessity of regulating corporations, it would seem incongruous to grant such a privilege to the corporation itself. The Court's recent decision in *Albertson* would appear to extend in scope to officers of an association who apparently differ in no wise from corporate officers in terms of official capacity, from which it can only be inferred that the Court takes some account of differences in the natures of the artificial entities involved.

8. See Meltzer, *Required Records, The McCarran Act, and The Privilege Against Self-Incrimination*, 18 U.CHI.L. REV. 687, 701–04 (1951). Professor Meltzer has directed the same discerning eye he has turned upon the merits of the Fifth Amendment privilege itself to criticism of the various theories offered to support denying it to corporations.

He finds most of these rationalizations less than cogent: *viz.* the theory that by becoming a corporate officer an individual has "waived" his privilege against self-incrimination *distinguishes inadequately* assertion of the privilege in the corporate record context from occasions where its invocation is thought legitimate, as when he is called upon to testify orally. Professor Meltzer notes also that, although the doctrinal arguments based upon the necessity of corporate regulation were undoubtedly the "considerations of expediency" underlying the refusal to grant the privilege to corporations, they "begged the essential question—the extent to which the visitorial power was subject to the constitutional provisions against self-incrimination." *Id.* at 702. Perhaps that central question can be resolved only in individual circumstances, when the interests of the government in disclosure are balanced against the individual or associational interests represented by the privilege. It is worthy of note that the case in which the absence of the corporate privilege was first noted arose out of antitrust charges. *Cf.* Hale v. Henkel, *supra* note 7.

9. The Court's reference in *White* to the necessity of effective regulation of the "economic" activities of incorporated and unincorporated organizations is not without significance. One who invests in a corporation or joins a labor union commits himself to the collective pursuit of economic ends, and the unit itself is mainly significant as a vehicle for the accomplishment of these joint economic purposes. Perfectly lawful in itself and, indeed, permitted only to exist by the favor of the law, a business corporation may in operation fall afoul of a multitude of public purposes embodied in regulatory laws with criminal sanctions. If these may be frustrated by the self-incrimina-

tions, the public interest in continuing access to the information relevant to regulation justified this restriction of the privilege. The test for allowing or withdrawing the privilege was formulated by the Court in these terms (322 U. S. at 701, 64 S.Ct. at 1252):

> This conclusion is not reached by any mechanical comparison of unions with corporations or with other entities nor by any determination of whether unions technically may be regarded as legal personalities for any or all purposes. The test, rather, is whether one can fairly say under all the circumstances that a particular type of organization has a character so impersonal in the scope of its membership and activities that it cannot be said to embody or represent the purely private or personal interests of its constituents, but rather to embody their common or group interests only.

If so, the privilege cannot be invoked on behalf of the organization or its representatives in their official capacity.

A standard of differentiating between organizations in terms of their "impersonal," as distinct from their "personal," character is admittedly elusive in meaning and difficult of application. It is clear, however, that the Supreme Court was not prepared to say that the privilege was without significance in respect of any and all organizations under any and all circumstances.[10]

■ Short of trying, in the abstract, to sort out associations for whom the privilege has meaning from those for whom it does not, it is useful to recall the reality which underlies them all. Although the law has made room for the concept of an artificial entity which, for some purposes at least, has a life

---

tion clause, then the only answer may be to abandon the corporate or associational concept—an exigency which few would now regard as in the public interest. An association of those who come together because of mutually congenial religious or political principles is arguably of a different stripe. The First Amendment has long been thought to be concerned with reasonable latitude to do just this, whereas the right to form a corporation or labor union is nowhere guaranteed in terms by the Constitution. Moreover, a man's beliefs are customarily regarded as closely akin to his "purely private or personal interests," and not even his association with a church or a political party converts them into the property of the entity. It is because the Communist Party has appeared to offend in this regard more than any other that it has become entangled with the criminal law, but this involvement is the occasion of our Fifth Amendment problem and not its solution.

10. The Court has, since *White*, found renewed life for the privilege as it relates to associational activities. In Curcio v. United States, 354 U.S. 118, 77 S.Ct. 1145, 1 L.Ed.2d 1225 (1957), the contempt citation of a union official who refused to tell the whereabouts of documents which he said were not within his control was reversed on the ground that, despite *White*, the privilege con-

tinued to protect oral testimony. McPhaul v. United States, 364 U.S. 372, 81 S.Ct. 138, 5 L.Ed.2d 136 (1960), does not control our decision here. In that case the Court upheld the contempt conviction of an officer who refused to produce records of his organization, the Civil Rights Congress before the House Committee on Un-American Activities. *McPhaul* arose out of an essentially informational Congressional investigation rather than a pervasive regulatory scheme of disclosure administered by the Executive branch in a criminal area; and the decision went off on the point, strongly contested by the dissent, of whether the government's failure to show the existence of the records and the defendant's ability to produce them before the contempt citation was entered violated the presumption of innocence in his favor. Rogers v. United States, 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344 (1951), cited in *McPhaul* as indicating the unavailability of the privilege, is *dictum* on that point, for that case turned on waiver of the privilege in circumstances where the witness had already admitted her membership and office in the Communist Party to the grand jury and had invoked the privilege only as an "afterthought" when she was brought before the District Court. See 340 U.S. at 370–372, 71 S.Ct. at 440; *id.* at 379 n. 7, 71 S.Ct. at 445 (dissenting opinion of Mr. Justice Black).

separate and distinct from the individuals who comprise it, it remains the fact that no such entity can act other than through human instrumentalities. Behind the corporate veil or the associational facade, there are always people —officers, stockholders, members. In the case of business corporations and labor unions, decisions like *Wilson* and *White* mean that the constituent individuals cannot, by reason of a claim of privilege, be excused from acting to provide the information demanded. This is because the public interest in the disclosure of the particular entity's affairs is deemed to be paramount; and, since that disclosure can only be effected by the act of some individual, he may be compelled to respond despite the Fifth Amendment. If he does not, both he and the entity, which necessarily remains inert without his action, can be subjected to criminal sanctions.

But, in the case of appellant and the Subversive Activities Control Act, we have heretofore held that criminal punishment may not be imposed for failure of appellant's officers to make the required disclosures on appellant's behalf. Communist Party v. United States, 118 U.S.App.D.C. 61, 67, 331 F.2d 807, 813, cert. denied, 377 U.S. 968, 84 S.Ct. 1646, 12 L.Ed.2d 737 (1964). And now the Supreme Court has, in *Albertson*, declared that the members of appellant may not, in the face of a claim by them of the privilege, be criminally punished, as contemplated in the Act, for failing to supply the principal item of information called for by the statute, that is to say, the membership list. The reasoning of *Albertson* with respect to members of the Party would appear to have clear application to officers who are, if anything, even more dangerously exposed to self-incrimination. This, to say the least, leaves appellant in a position sharply contrasting with that of the artificial entities involved in cases like *Wilson* and *White*. It has been commanded by the Congress, on pain of criminal punishment, to come forward and reveal its affairs, but the Court has said that, in the climate of criminality created by other legislation, the persons who could accomplish those revelations need not do so by reason of the Fifth Amendment.

To the lay observer equipped only with a sure sense of logic and unconfused by the legal lore of the assertedly personal nature of the privilege, this all might suggest that the Act, like King Canute, vainly commands the impossible; and that the legislative scheme has a flavor of irrationality in a due process sense. But this condition of ineffectiveness to encompass the criminal punishment of appellant for something it lacks the means to accomplish derives in the last analysis from the Fifth Amendment's privilege against self-incrimination. The result is surely the same whether it be stated in terms of the availability of the privilege to appellant because of its distinctive nature, or whether it be said that it is a violation of the privilege concededly available to the individuals associated with appellant to condition its exercise upon the sacrifice of their First Amendment rights to associate together as a political party. In either formulation, it is the First Amendment which provides the distinctive background against which the reach of the Fifth must be defined; and, in either formulation, the Constitution, on the facts of this record, stands between appellant and the criminal punishment sought to be laid upon it.

■ It is important to recall that no political party, including most especially the Communist, is automatically guaranteed against regulation by means of disclosure.[11] It is when the legislative

---

11. In 1954, four years after the passage of the Act with which we are concerned, Congress purported to find and declare that appellant is not a political party at all and "should be outlawed." This statute—the Communist Control Act of 1954, 68 Stat. 775–777, 50 U.S.C. §§ 841–844 (1964)—purported to deny to appellant all of the rights, privileges, and immunities available to other legal enti-

judgment is that disclosure is not enough and goes on to fashion criminal prohibitions as well that the efficacy of disclosure is imperilled by the Fifth Amendment. What we say here imposes no limitations upon the exertion of either approach in its fullest sweep. We speak only to the self-incrimination problem presented by the simultaneous employment of both.

It is important to turn from generalities to an examination of the position in which this record shows appellant to have been placed. At a time when, as the Supreme Court has now said, appellant found itself in "an area permeated with criminal statutes," where even mere association with, much less membership in, appellant presented a serious "threat of prosecution," appellant is first declared by the Board to be a "Communist-action organization" which, by statutory definition, is an organization "substantially directed, dominated, or controlled by the foreign government or foreign organization controlling the world Communist movement referred to in * * * this title," and which "operates primarily to advance the objectives of such world Communist movement * * *." By virtue of this declaration, appellant is required to register itself as a "Communist-action organization" and to supply, in addition to its name and address, the names and addresses of its officers and members (including those who have been such during the preceding 12 months) ; a statement of the functions and duties of the former; the *aliases*, if any, of such individuals; all moneys received and expended, including

---

ties, but it included a statement to the effect that nothing in it should be construed as amending the Internal Security Act of 1950, of which latter statute the Subversive Activities Control Act is a part. This prudential proviso reflected the apprehensions of those in Congress who thought that the regulation-by-disclosure approach of the last-mentioned statute was gravely jeopardized, in its applicability to appellant, by the 1954 law. In *Communist Party*, decided seven years later, the Supreme Court, although relying heavily on the legislative findings of the 1950 statute in upholding the registration order as against First Amendment attack, referred to the 1954 findings only in a context of saying that there was nothing to indicate that the Board had been prejudicially influenced by them in reaching its decision that appellant should register as a Communist-action organization.

The majority in *Communist Party* did not intimate that appellant was not a political association within the general purview of the First Amendment. It held, rather, that it was a currently erring one, which could restore itself to grace by mending its ways; and that the First Amendment did not protect appellant from disclosure because, as a party, appellant could be found by the evidence to have come under the dominance of a foreign country and thereby to have become but one of the sections, in the Congressional language, "of a world-wide Communist organization * * * controlled, directed, and subject to the discipline of the Communist dictatorship of such foreign country." Although these words today may have an ironic ring in the ears of the foreign power in question, and in any event have not appeared to constitute the sole assumption upon which our foreign policy has been conceived and executed since they were placed on the statute books, we may assume that, as did the Supreme Court in *Communist Party*, they were true as of that time. Compare Block v. Hirsh, 256 U.S. 135, 41 S.Ct. 458, 65 L.Ed. 865 (1921), with Chastleton Corp. v. Sinclair, 264 U.S. 543, 44 S.Ct. 405, 68 L.Ed. 841 (1924), in which latter case Justice Holmes observed that, to the extent a Congressional declaration of fact looks to the future, "it can be no more than prophecy and is liable to be controlled by events." *Id.* at 547, 44 S.Ct. at 406. The efficacy of the legislative findings in this instance has been very considerable indeed, in that they appear to have been given great weight by the Supreme Court in upholding the registration order as against First Amendment challenge, thereby making it possible for the Congress to regulate appellant by the disclosure technique. They do not conclude the issue of the possible Fifth Amendment impediment to the utilization of that approach coincidentally with that of the criminal law. Were it otherwise, there would have been no reason for the Court to have reserved the Fifth Amendment issue.

sources and objects; and a list of all printing presses or machines owned, controlled, or possessed by any of them. Once so registered, an annual report of all such information is required. There is a further requirement that each such registered organization shall keep accurate records of receipts and expenditures, and of the names and addresses of its members and of all persons who actively participate in its affairs.

Faced with these requirements, appellant wrote a letter to the Department of Justice on a letterhead showing the Party's name, address, and telephone number. The letter was signed in appellant's name "by its authorized officers." It advised the Department that its officers declined, by reason of the Fifth Amendment privilege, to supply, or to authorize the supplying of, the additional information called for by the registration requirements. The letter also advised that appellant, on behalf of its members, asserted the privilege of each of them against self-incrimination by the listing of his name or the furnishing of the other information called for.

The Government rejected this claim of privilege, and appellant was indicted. Its first conviction was reversed by us as hereinabove described. At the second trial, the Government sought to supply the deficiencies of proof alluded to by us in our opinion of reversal. The new elements of proof at the second trial consisted of two witnesses who had joined appellant in 1953 and who had served as paid informers of the Federal Bureau of Investigation throughout their entire periods of membership. Each testified to a willingness to sign the registration forms and to supply the requisite information if it were made available to them by appellant, which is to say, by some officer or member of appellant.

The record is devoid of any suggestion of the availability of any officer or member of appellant (not a paid informant), or indeed of any third person, with access to the necessary information, who has the requisite authority and capacity to supply the information called for, and who is prepared to do so. *Albertson* teaches that any such person cannot, consistently with the Fifth Amendment, be made to do so. Since appellant cannot, in the nature of things, act except through such a person, a legislative scheme premised upon such action in essence comprehends the collective punishment of persons for their constitutionally protected right as individuals to refrain from that action.

For appellant to file a list of its members exposes every person on that list to a serious and substantial "threat of prosecution." The only people with the authority and capacity to compile an authentic such list and to authorize its use for registration purposes would, by that very act, subject themselves to a like threat. No such person has demonstrated a willingness to act. To differentiate under these circumstances between the criminal punishment of the association, on the one hand, and the individuals who make of it a collective personality, on the other, seems to us incompatible with the purposes and values underlying the Fifth Amendment. It is to make the mere fact of association the vehicle for subjecting the individuals, collectively as well as personally, to criminal prosecution, shorn of the protection of the self-incrimination privilege.[12]

12. *Albertson* now assures to each individual Party member his Fifth Amendment right not to incriminate himself by registering under the Act. If the Party is denied the privilege, the membership of the individual must be disclosed in the course of the Party's registration. Under such circumstances, the privilege against self-incrimination is effectively conditioned upon abstention from association with others of like persuasion. In *Aptheker* Note 3 *supra*, the Government argued that a member of a registering organization could recapture his freedom to travel by abandoning his membership. But the Supreme Court turned this contention aside by saying that "Since freedom of association is

▆ The statutory scheme before us accordingly must yield to the urgency of continuing recognition of the vitality of the Fifth Amendment protections. Liability of the appellant to the command of the statute can not be vicariously imposed because of the failure of its members to meet the requirements of registration where, as the Supreme Court has made clear, they as individuals are so protected.

In the areas of First Amendment concern, such as politics and religion where the association of people together is of the essence of meaningful observance and expression, we see no inescapable necessity to limit the reach of the Fifth Amendment by technical theories of artificial legal personality. If Congress chooses to find some principles and practices of politics or religion so abhorrent as to warrant criminal liability, it may conceivably do so in a proper case. But to be placed beyond the pale of the First Amendment is not to be deprived of the Fifth. It is, rather, the very reason for its being; and that reason invalidates the criminal convictions of appellant under the circumstances of this case.

The judgments of conviction appealed from are

Reversed.

PRETTYMAN, Senior Circuit Judge (concurring).

I agree that the disclosure provisions of this statute are valid in and of themselves, and I agree further that the provisions for criminal sanctions are valid in and of themselves, separately. Upon the problem whether the combination of the two, as presented to us on this record, is valid, I reach the same result as do my brethren, but by a slightly different course of reasoning.

The Communist Party is an unincorporated association, and, being an incorporeal entity, it can perform physical acts, such as signing and filing, only through the instrumentality of human individuals. Therefore, when the statute requires the Party to sign and file, it is in reality requiring some individual to sign and file. The Government seeks, by threat of punishment of the Party, to compel an individual to sign and file a list of the Party members.

Membership in or association with the Communist Party involves such a threat of prosecution as to give rise to Fifth Amendment rights in members or associates. The Supreme Court so said in *Albertson*,[1] and in that case the Court held that members of the Party cannot be compelled to sign and file on behalf of themselves a statement that they are members. It seems clear to me that in view of that decision Party members cannot be compelled to sign and file on behalf of anybody or anything else a statement that they, the signing individuals, are members of the Party.[2] The constitutional protection is against compulsory incrimination of oneself. The means or method of the compulsion are immaterial so long as there is compulsion. Therefore the members cannot be compelled to incriminate themselves in order to protect the Party against punishment.

Furthermore, since the Party is an unincorporated group of individuals, the fine upon the Party is in reality a

---

itself guaranteed in the First Amendment [citations omitted], restrictions imposed upon the right to travel cannot be dismissed by asserting that the right to travel could be fully exercised if the individual would first yield up his membership in a given association." 378 U.S. at 507, 84 S.Ct. at 1664, 12 L.Ed.2d 992. In two very recent decisions, Garrity v. New Jersey and Spevack v. Klein, 385 U.S. 493, 511, 87 S.Ct. 616, 625, 17 L.Ed.2d 562, 574 both decided January 16, 1967, the Court has stressed the

importance of free and unfettered choice to assert the self-incrimination privilege. 385 U.S. 511, 87 S.Ct. 636, 17 L.Ed.2d 574 (Nos. 13, 62).

1. Albertson v. Subversive Activities Control Board, 382 U.S. 70, 86 S.Ct. 194, 15 L.Ed.2d 165 (1965).

2. *Cf.* Communist Party of the United States v. United States, 118 U.S.App. D.C. 61, 331 F.2d 807 (1963), cert. denied, 377 U.S. 968, 84 S.Ct. 1646, 12 L.Ed.2d 737 (1964).

fine upon the individuals comprising the Party. I think no member of an unincorporated group can be compelled to incriminate himself in one respect in order to avoid another criminal punishment threatened against him as a member of the group.

In this consideration it makes no difference whether the group as such is constitutionally protected or not. The individual is protected as an individual, no matter in what capacity. If the compulsion is visited upon him through the intermediary group as a conduit, the compulsion is forbidden. The cases, like *White*,[3] which hold that an officer of an association can be compelled to incriminate himself by revealing group records, rest upon the thesis that the public interest in the visitorial power over associations nullifies the individual officers' Fifth Amendment protection. But that thesis does not apply here, because *Albertson* held that the Fifth Amendment rights of Party members do not yield to the public interest in the disclosure of the Party membership.

The suggestion is made that a volunteer might come forward and register the Party and that the two F.B.I. agents (undercover members) are such volunteers. But those two, willing though they be, do not have the wherewithal to register the Party; they do not have the list of the membership. So the question is whether the officers or some member can be compelled to supply the willing volunteers with copies of the list. The purpose for which the volunteers want the list is to file it, thus bringing upon the listed members a threat of criminal prosecution. It seems clear to me that a person cannot be compelled to supply another person (volunteer or not) with the means by which to incriminate the first person. This is two-step incrimination, but it seems to me that the person is incriminating himself just as effectively as if he himself handed the list to the Government; and he cannot be compelled to do it.

The same reasoning as that outlined in the preceding paragraph applies to the suggestion that the Party might hire an agent and pay him a fee to execute the registration. It might, of course, but our problem is whether it can be compelled to do so. It seems to me close to frivolous to suggest that a person protected by the Fifth Amendment can be compelled to hire an agent, furnish him with the means to instigate a criminal prosecution against him (the giver), and then authorize him (the agent) to do so.

I think the Government cannot compel people to incriminate themselves, either by testifying or by supplying documentary evidence, and either by themselves supplying an incriminatory document or by giving it to a volunteer or a hired agent to give to the Government. In short, I think a person cannot be compelled to incriminate himself, either directly by his own action or by a second-, third- or fourth-hand action through some complicated intermediary process.

I emphasize that no part of my thought rests upon Fifth Amendment rights of the Party itself. I am concerned only with the Fifth Amendment rights of the individual members or agents.

I think a statute which requires members or agents of an unincorporated organization to incriminate themselves in order to protect their organization against a fine in a criminal action is invalid as thus applied.

3. United States v. White, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944).