**Robert M. SHELTON, Appellant,**

v.

**UNITED STATES of America, Appellee.**

No. 20587.

United States Court of Appeals
District of Columbia Circuit.

Argued April 6, 1967.

Decided Aug. 14, 1968.

Petition for Rehearing Denied
Oct. 15, 1968.

Certiorari Denied Jan. 13, 1969.
See 89 S.Ct. 634.

Mr. Lester V. Chalmers, Jr., Raleigh, N. C., of the bar of the Supreme Court of North Carolina, pro hac vice, by special leave of court, and Mr. Paul Shiffman, Washington, D. C., for appellant.

Mr. Robert L. Keuch, Atty., Department of Justice, with whom J. Walter Yeagley, Asst. Atty. Gen., Messrs. David G. Bress, U. S. Atty., and Kevin T. Maroney, Atty., Department of Justice, were on the brief, for appellee. Mr. Frank Q. Nebeker, Asst. U. S. Atty., also entered an appearance for appellee.

Mr. Thurman Arnold, Washington, D. C., (appointed by this court), with Mr. Daniel A. Rezneck, Washington, D. C., filed a brief as amicus curiae, after argument.

Before BAZELON, Chief Judge, FAHY, Senior Circuit Judge, and WRIGHT, Circuit Judge.

FAHY, Senior Circuit Judge:

Robert M. Shelton appeals from a judgment entered upon à jury's verdict finding him guilty of contempt of Congress in violation of 2 U.S.C. § 192.[1] He is under sentence of one year imprisonment and a fine of $1,000.00. We affirm.

The case arose and progressed as now explained. Mr. Shelton was served on October 11, 1965, with a subpoena *duces tecum*, issued a few days earlier by a Subcommittee of the House Committee on Un-American Activities. The subpoena summoned him to appear as a witness before the full Committee or a Subcommittee thereof and to bring with him and produce items specified in an attachment to the subpoena consisting of five numbered paragraphs. The first four paragraphs specified books, records, documents, correspondence and memoranda

---

1. 2 U.S.C. § 192 (Supp.1967) provides:

Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, or any joint committee established by a joint or concurrent resolution of the two Houses of Congress, or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than one month nor more than twelve months.

of named Klan organizations which were in his possession, custody or control, or which were maintained by or available to Mr. Shelton as Imperial Wizard of the organizations. The fifth paragraph called for the production of copies of Mr. Shelton's individual income tax returns for the years 1958 through 1964. The full text of the subpoena is set forth in an Appendix to this opinion.

On October 19, 1965, Mr. Shelton appeared with counsel in response to the subpoena at a hearing of the Subcommittee which had issued the subpoena and which had previously been authorized by the full Committee to conduct the investigation. At that time Mr. Shelton was asked to produce the documents called for in each of the five paragraphs of the attachment.[2] He refused to produce anything called for in the subpoena.[3] On October 20, 1965, Mr. Shelton again appeared before the Subcommittee. This time he was directed to produce only the documents specified in the first four paragraphs of the attachment, which he refused to do.[4] He was not asked to produce copies of the individual tax returns referred to in paragraph (5). Mr. Shelton gave the following reasons for his refusal to produce:

> Sir [addressing the Chairman], I respectfully decline to deliver to this committee any and all records as requested by this committee under subpena dated October 7, 1965, for that information is not relevant and germane to the subject under investigation, and the same would not aid the Congress in the consideration of any valid remedial legislation, nor is such inquiry within the scope of that au-

thorized to be investigated by Rule IV [sic] of the rules adopted by the 89th Congress, of House Resolution 8, adopted January 4, 1965.[5]

> I respectfully decline to turn over these documents in question for the reason that I honestly feel that by doing so it might tend to incriminate me in violation of my rights as guaranteed to me by amendments 5, 1, 4, and 14 of the Constitution of the United States of America.[6]

On January 6, 1966, the Subcommittee reported to the full Committee and recommended in accordance with its report that Mr. Shelton be cited for contempt for his refusal to produce the documents and items set forth only in paragraphs (1) and (4) of the subpoena.[7] On January 13, 1966, the full Committee adopted the Subcommittee's report.[8] On February 2, 1966, the House adopted H.Res. 699, which provided that the Speaker should

> certify the report of the Committee on Un-American Activities * * * as to the refusals and failures of Robert M. Shelton to produce certain pertinent papers in compliance with a subpena served upon him as ordered before a duly authorized subcommittee * * to the United States Attorney for the District of Columbia. * * *[9]

Thus, the House cited Mr. Shelton only for his failure to produce the items in the first four paragraphs, which did not include copies of his individual income tax returns, and the indictment and conviction are likewise limited to his failure and refusal to produce on October 20 any of the items requested in paragraph (1) through (4) of the subpoena.[10]

---

2. H.R.REP. No. 1241, 89th Cong., 2d Sess. 14–19 (1966).

3. *Ibid.*

4. *Id.* at 33–35.

5. At the trial defense counsel agreed that the reference to "Rule IV" was erroneous and that Mr. Shelton had intended to refer to Rule XI.

6. H.R.REP. No. 1241, *supra* note 2, at 34–35.

7. *Id.* at 48–49.

8. *Id.* at 49–50.

9. H.Res. 699, 89th Cong., 2d Sess. (1966).

10. Neither in the trial court nor in this court has Mr. Shelton made any contention with respect to the inclusion of paragraph (5) within the subpoena.

We consider now the sufficiency of the reasons which Mr. Shelton advanced before the Subcommittee for his refusal to produce these documents. Except as we shall later note we cover in this manner all defenses he advanced at trial and all contentions he makes on this appeal.

1. He apparently objected that the House of Representatives had never authorized an investigation of the Klan. The record demonstrates the contrary. On January 4, 1965, the House of the 89th Congress adopted as its Rules those of the House of the 88th Congress, with amendments not relevant to this case.[11] Rule XI, 18(b) authorized the Committee on Un-American Activities,

> to make from time to time investigations of (1) the extent, character, and objects of un-American propaganda activities in the United States, (2) the diffusion within the United States of subversive and un-American propaganda that is * * * of a domestic origin and attacks the principle of the form of government as guaranteed by our Constitution, and (3) all other questions in relation thereto that would aid Congress in any necessary remedial legislation.

On March 30, 1965, Representative Willis, Chairman of the full Committee, introduced H.Res. 310, which called for the appropriation of a sum not to exceed $50,000 in order to pay the

> additional expenses of conducting the investigations authorized by section 18 of rule XI of the Rules of the House of Representatives, incurred by the Committee on Un-American Activities, acting as a whole or by subcommittee, in investigating the Ku Klux Klan organizations in the United States, for the purpose of aiding the Congress in the consideration of any necessary remedial legislation. * * * [12]

On April 14, 1965, after extensive debate, this resolution was agreed to by the House vote of 313 to 43. And see the Committee resolution of March 30, 1965, n. 20 *infra*.

2. He objected that the investigation would not aid the Congress in the discharge of any valid legislative purpose. We think this objection not well founded.

It is settled that "the power of inquiry—with process to enforce it—is an essential and appropriate auxiliary to the legislative function. It was so regarded and employed in American Legislatures before the Constitution was framed and ratified." McGrain v. Daugherty, 273 U.S. 135, 174, 47 S.Ct. 319, 328, 71 L.Ed. 580. This is so because,

> A legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change; and where the legislative body does not itself possess the requisite information—which not infrequently is true—recourse must be had to others who do possess it.

*Id.* at 175, 47 S.Ct. at 329.

The scope of this essential power of Congress was delineated in Watkins v. United States, 354 U.S. 178, 77 S.Ct. 1173, 1 L.Ed.2d 1273. The defendant there appeared before a Subcommittee of the House Un-American Activities Committee in compliance with a subpoena and refused to state whether certain persons had or had not been members of the Communist Party. The Supreme Court reversed the defendant's conviction for contempt of Congress, but recognized as a "basic premise,"

> The power of the Congress to conduct investigations is inherent in the legislative process. That power is broad. It encompasses inquiries concerning the administration of existing laws as well as proposed or possibly needed statutes. It includes surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them.

11. H.Res. 8, 89th Cong., 1st Sess. (1965).

12. H.Res. 310, 89th Cong., 1st Sess. (1965).

*Id.* at 187, 77 S.Ct. at 1179. And see Barenblatt v. United States, 360 U.S. 109, 111, 79 S.Ct. 1081, 3 L.Ed.2d 1115.

■ The Court declared, however, in *Watkins,* that, although "broad," the power of inquiry "is not unlimited," noting at least two limitations. First, "there is no general authority to expose the private affairs of individuals without justification in terms of the functions of the Congress." Second, Congress is not "a law enforcement or trial agency. These are functions of the executive and judicial departments of government." The object of the particular inquiry in question must be examined to ascertain whether it is within the broad investigative authority of Congress.

The Supreme Court has recognized that several sources are available in aid of ascertaining this. One of these is the resolution of the Congress authorizing the inquiry. Wilkinson v. United States, 365 U.S. 399, 408, 81 S.Ct. 567, 5 L.Ed.2d 633; Watkins v. United States, *supra,* 354 U.S. at 209, 77 S.Ct. 1173. Others are the opening statement of the Chairman at the hearings; and statements of the members of the committee, Watkins v. United States, *supra,* 354 U.S. at 209, 77 S.Ct. 1173, or of the Staff Director, Wilkinson v. United States, *supra,* 365 U.S. at 408, 81 S.Ct. 567, during the hearing. The pattern of interrogation of witnesses may also be of help. *Ibid.* "All these sources indicate the existence of a legislative purpose." *Id.* at 410, 81 S.Ct. at 574.

The broad purpose of the present inquiry as stated in H.Res. 310, *supra,* was to "investigat[e] the Ku Klux Klan organizations in the United States, for the purpose of aiding the Congress in the consideration of any necessary remedial legislation. * * *" The vagueness which fatally characterized the situation in *Watkins* does not appear.

■ In deciding whether the purpose is within the legislative function, the mere assertion of a need to consider "remedial legislation" may not alone justify an investigation accompanied with compulsory process; but when the purpose asserted is supported by references to specific problems which in the past have been or which in the future could be the subjects of appropriate legislation, then we cannot say that a committee of the Congress exceeds its broad power when it seeks information in such areas.

During the debate on H.Res. 310, Representative Willis outlined the purposes of the investigation. He stated to the House that if legislation were proposed "it must not only meet all constitutional tests, but it must be realistic. It must be based on thorough and sound knowledge of just how these Klan organizations operate."[13] The Chairman further explained the preliminary studies which had been made, leading to the request for a full investigation and for funds to conduct it. He said in part:

The Brookings Institution published its finding in 1945. Based on its study of rule XI, the U. S. Constitution, and also the oath required of all persons seeking U. S. citizenship, the Institution found five "definite substantive standards" for judging un-American activities. The first one read very much like a description of what, evidence indicates, the Klans are doing today:

It is un-American for any individual or group by force, intimidation, deceit, fraud or bribery, to prevent or seek to prevent any person from exercising any right or privilege which cannot constitutionally be denied to him either by the Federal Government or by a State government.[14]

\*    \*    \*    \*    \*    \*

Any group that engages in organized, large-scale intimidation in the political, economic and social fields and terrorizes individual and groups, attacks the very root of the demo-

---

13. 111 Cong.Rec. 8025 (1965).

14. *Id.* at 8024–8025.

cratic process. It does so because it destroys freedom and, without free citizens, our representative form of government is not secure and cannot be preserved.[15]

And further,

It is, of course, too soon to predict what kind of legislation might be indicated to deal with the Klan organizations. Much will depend upon the nature, the administration and practices of the various Klan organizations, the control, or lack of it, by their responsible officers, and such matters.

Generally speaking, the Klans are oath-bound organizations, some of which have their own constitutions and even legislatures and enforcement officers, and require oaths of various kinds, some possibly in conflict with the Federal Constitution.

Depending on what we find, it might be desired to outlaw the organizations and penalize them and their "knowing" members. Or a certain type of control could probably be exercised over the Klans by a registration statute, either like the one in the Internal Security Act or the New York State Act which required oath-bound organizations—other than unions and benevolent orders—to register, giving their membership.[16]

Thus, the Chairman stated that the Committee was concerned with the possible denial of the free exercise of any constitutionally guaranteed right or privilege, with group intimidation in the political, economic, and social fields, and with a possible conflict between organizational oaths and the Constitution. Mr. Willis suggested some possible legislative approaches to these problems. We do not think that an investigation of organizations which might be engaging in activi-

ties of the sort referred to is beyond the power of Congress.[17]

3. Mr. Shelton also objected that the information sought was not relevant to the investigation. Again we cannot sustain the objection. We have no basis for holding, and Mr. Shelton supplies none, that the data requested with respect to the organization and operation of the Klan and its associated organizations would not be relevant to an investigation of the Klan and those organizations with the view to possible legislation in the area of their activities.

4. He objected that turning over the documents "might tend to incrimate me in violation of my rights as guaranteed to me by amendments 5, 1, 4, and 14 of the Constitution. * * * " Thus, at the hearing all constitutional objections which were advanced were solely in support of Mr. Shelton's claim of possible self-incrimination. At trial and now on appeal in one respect he is more specific; that is, he relies upon the First Amendment in contending that compliance with the subpoena would have required him to furnish a listing of every member of the organization, in violation of the freedom of association of members guaranteed by the First Amendment. He cites Bates v. City of Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480, and NAACP v. State of Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488. Assuming that we should consider this objection as having been made at the hearing, we cannot sustain it as absolving Mr. Shelton of contempt. In both Bates and NAACP the membership lists were explicitly directed to be produced. In the present case, however, the subpoena in this connection refers only to "unexecuted forms relating to applications for membership." Let us assume,

---

15. *Id.* at 8024.

16. *Id.* at 8025.

17. No case is made by appellant that the investigation was for exposure. See Watkins v. United States, *supra*, 354

U.S. at 187, 77 S.Ct. 1173. The possibility of unfavorable exposure does not defeat an investigation otherwise motivated and within the broad power in Congress to legislate to protect civil and individual liberties.

however, that lists of members would be among the other records called for in the subpoena. The fact remains that Mr. Shelton was not tried for contempt in not complying with a demand for membership lists, as were the parties charged in *NAACP* and *Bates*. Even if Mr. Shelton would not have been in contempt for refusing to produce membership lists had objection to doing so been made and denied, the blanket manner of his refusal to produce anything requested does not present such a basis for avoiding contempt.

In *NAACP* the Court explicitly distinguished People of State of New York ex rel. Bryant v. Zimmerman, 278 U.S. 63, 49 S.Ct. 61, 73 L.Ed. 184, involving the New York Ku Klux Klan, saying in a respect especially applicable to our case:

> There [in People of State of New York ex rel. Bryant v. Zimmerman], this Court upheld, as applied to a member of a local chapter of the Ku Klux Klan, a New York statute requiring any unincorporated association which demanded an oath as a condition to membership to file with state officials copies of its " * * * constitution, by-laws, rules, regulations and oath of membership, together with a roster of its membership and a list of its officers for the current year." N.Y. Laws 1923, c. 664, §§ 53, 56. * * * [T]he situation before us is significantly different from that in *Bryant,* because the organization there had made no effort to comply with any of the requirements of New York's statute but rather had refused to furnish the State with *any* information as to its local activities.

357 U.S. at 465–466, 78 S.Ct. at 1173.

It is quite true here, as it was of the New York Klan in *Bryant,* that Mr. Shelton "made no effort to comply with any of the requirements [of the subpoena] but rather had refused to furnish [the Subcommittee] with *any* informa-

tion" requested, thus causing his position to encounter the difficulties expounded also in McPhaul v. United States, 364 U.S. 372, 81 S.Ct. 138, 5 L.Ed.2d 136, and United States v. Bryan, 339 U.S. 323, 70 S.Ct. 724, 94 L.Ed. 884.

That the First Amendment objection raised before the Subcommittee does not help Mr. Shelton is emphasized further by his failure at trial, although contending then that he should not be required to furnish the membership list, to offer to furnish anything, demonstrating that his unwillingness to comply with the requests of the Committee was not due to unwillingness to supply any list of members which might be in his possession or control.

In *NAACP* the Court held that the State of Alabama lacked a sufficient interest in the membership of the National Association for the Advancement of Colored People to offset the deterrent effect the furnishing of the lists would have on the members' right of association protected by the First Amendment. It was on this ground that the Court sustained the right of the organization itself to refuse disclosure of its members.[18] To similar effect is *Bates*. No issue of this character was suggested to the Subcommittee by Mr. Shelton.

5. As we have seen Mr. Shelton's Fourth Amendment objection was advanced only as part of his self-incrimination objection. For this reason perhaps it could be rejected as inadequate for the reasons we hereinafter give for holding his Fifth Amendment objection unavailing. But we do not rest upon this ground. If Mr. Shelton felt he could refuse compliance because he considered the subpoena so broad as to constitute an unreasonable search or seizure within the prohibition of the Fourth Amendment, then to avoid contempt for complete noncompliance he was under obligation to inform the Subcommittee of his position. The Sub-

---

18. We pass over the question whether Mr. Shelton had standing to assert the First Amendment rights of Klan members.

committee would then have had the choice of adhering to the subpoena as formulated or of meeting the objection in light of any pertinent representations made by Mr. Shelton. McPhaul v. United States, *supra*, 364 U.S. at 379, 81 S.Ct. 138; United States' v. Bryan, *supra*, 339 U.S. at 333, 70 S.Ct. 724.[19] He simply failed to cooperate at all in an inevstigation within congressional authority, choosing neither to produce anything nor indeed to object before the Subcommittee to the production of any particular item. In this situation it does not seem to us that we are required to decide whether the subpoena was so broad as to constitute an unlawful search or seizure; for the conviction of Mr. Shelton does not rest upon his failure to respond because he deemed the subpoena to be so broad as to be invalid. Contempt which might be avoided if valid and timely objection is made and denied is not avoided by refusing to produce what one lawfully could not be required to produce if such objection had been made and denied. *Bryan* and *McPhaul*, both *supra*.

The Supreme Court has added a corollary to the rule of the *Bryan* and *McPhaul* cases. The rule that the defendant must make his objections to the procedures of a congressional committee when he appears before the committee does not apply unless the ground of objection was known to the witness at that time. Yellin v. United States, 374 U.S. 109, 122–123, 83 S.Ct. 1828, 10 L.Ed.2d 778, followed by this court in Liveright v. United States, 120 U.S. App.D.C. 379, 347 F.2d 473. Clearly this corollary to the rule is of no help to Mr. Shelton. Moreover, we have no basis for concluding that the scope of the subpoena was so broad as to violate the Fourth Amendment. In this connection we advert to our discussion above of the breadth of the investigation

19. There was a strong dissent in *McPhaul* but not because of the ruling we rely upon. The dissent was on the ground that the government had not met its burden of proof that McPhaul was a member of the organization whose records were sought or was in a position to produce them. He had raised these issues at trial in support of his motion for a directed verdict. Mr. Shelton made no claim of this character either before the Subcommittee or at trial. It is mentioned for the first time in his brief on appeal, notwithstanding the same brief states that to comply with the subpoena appellant "must in fact empty the contents of his office and provide the Committee with a listing of every member of the organization," thus acknowledging Mr. Shelton's possession or control of the records. Moreover, the trial clearly disclosed that the records sought were in the control of Mr. Shelton. This appears from the testimony of John H. Murrell, Jr., and Internal Revenue Agent who had had a conversation with Mr. Shelton about the Klan records: "Mr. Shelton told me that something had come up and that the records had been subpoenaed by the House Un-American Activities Committee and that he was afraid to produce them [for Mr. Murrell] at that time so long as they were under subpoena. After some further discussion he agreed to talk with his attorney and let me see them at a later date if it was all right with the attorney. * * * [He] told me that they had complete records." This conversation was on October 11, 1965. During cross-examination of Mr. Murrell Mr. Shelton's counsel stated at the bench: "I want to show also that Mr. Shelton contended these [apparently the Internal Revenue Service] were the proper people to examine his books and performance and that he would turn over to them every book except membership lists. * * * [O]ur contention is if he had turned over everything in his possession he would have turned over a list of all the members of the United Klans of America," contrary to NAACP v. State of Alabama and Bates v. City of Little Rock. The court inquired whether Mr. Shelton, when he appeared before the Committee indicated in any way he would turn over all documents in his possession which were available to him with the exception of the so-called list. Mr. Shelton's counsel responded: "No, sir, he did not, and of course the subpoena duces tecum we contend did not include membership lists." As to this last remark, however, Mr. Shelton's counsel elsewhere asserted that the subpoena did cover membership lists, though it is clear it did not specify them as such.

itself, limited as it was, however, to the Klan organizations. The breadth of the investigation points to the likelihood of relevance to it of the records sought, and this in turn supports the reasonableness under the Fourth Amendment of the demand for them. The investigation was not directed to any specific activity of the Klan organizations.[20] It was a general investigation of their organization and activities in areas of legitimate concern to the Congress.

Finally, as to the Fourth Amendment, we may not assume that to comply with the subpoena *duces tecum* would have been oppressively burdensome. The record is bare of any evidence as to the quantity of documents involved. We have only the remark of counsel in his brief that to comply Mr. Shelton would have to empty the contents of his office, n. 19, *supra*.

■ 6. As to the Fifth Amendment privilege, except as to copies of certain individual income tax returns, for refusing to produce which he was not cited or indicted,[21] the subpoena did not call upon Mr. Shelton to produce any personal papers, but only those of Klan organizations. Of these it sought only those in his possession, custody or control, or maintained by or available to him, in his "capacity as Imperial Wizard of the Invisible Empire," Ku Klux Klan, etc. The privilege accordingly was not available to him as a basis for refusing to produce.

The constitutional privilege against self-incrimination is essentially a personal one, applying only to natural individuals.

\* \* \* \* \* \*

Since the privilege against self-incrimination is a purely personal one, it cannot be utilized by or on behalf of any organization, such as a corporation. Hale v. Henkel, 201 U.S. 43 [26 S.Ct. 370, 50 L.Ed. 652]; Wilson v. United States, 221 U.S. 361 [31 S.Ct. 538, 55 L.Ed. 771]; Essgee Co. [of China] v. United States, 262 U.S. 151 [43 S.Ct. 514, 67 L.Ed. 917]. See also United States v. Invader Oil Corp., [D.C.], 5 F.2d 715. Moreover, the papers and effects which the privilege protects must be the private property of the person claiming the privilege, or at least in his possession in a purely personal capacity. Boyd v. United States, 116 U.S. 616 [6 S.Ct. 524, 29 L.Ed. 746].

United States v. White, 322 U.S. 694, 698–699, 64 S.Ct. 1248, 1251, 88 L.Ed. 1542.

[I]t is well settled that "[b]ooks and records kept 'in a representative rather than in a personal capacity cannot be the subject of the personal privilege against self-incrimination, even though production of the papers might

20. On March 30, 1965, the full Committee had resolved:
WHEREAS, at the commencement of the 89th Congress the Chairman instructed the staff to commence a preliminary inquiry into the activities of the Ku Klux Klan organizations in the United States to assist the Committee in determining whether it should authorize an investigation of the Klan organizations; and
WHEREAS, the Committee on February 2, 1965, by resolution, unanimously directed the Chairman to continue the preliminary inquiry; and
WHEREAS, the Chairman has today made a report to the Committee on the results of this preliminary inquiry, which report clearly indicates that the nature and scope of the Klan organizations' activities are such that the Committee should authorize an investigation; and
WHEREAS, the President's recent public appeal also demonstrates that such an investigation is justified and necessary; and
WHEREAS, the President has offered the full cooperation of the Executive Branch of the Government in such an investigation; now, therefore,
BE IT RESOLVED, that the Committee undertake an investigation of the various Klan organizations and their activities with the view of holding hearings for the purpose of aiding Congress in any necessary remedial legislation; and \* \* \*.

21. See text accompanying note 10, *supra*.

tend to incriminate [their keeper] personally.' United States v. White, 322 U.S. 694, 699 [64 S.Ct. 1248, 88 L.Ed. 1542] (1944)." Rogers v. United States, 340 U.S. 367, 372 [71 S.Ct. 438, 95 L.Ed. 344]. And see Curcio v. United States, 354 U.S. 118, 122–123 [77 S.Ct. 1145, 1 L.Ed.2d 1225].

McPhaul v. United States, *supra*, 364 U.S. at 372, 380, 81 S.Ct. at 143. See, also, Wilson v. United States, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771; George Campbell Painting Corp. v. Reid, 392 U.S. 286, 88 S.Ct. 1978, 20 L.Ed.2d 1094. Mr. Shelton did not interpose the privilege on behalf of the Klans or members of the Klans, but solely on his own personal behalf. Cf. Mancusi v. DeForte, 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154.

■■■ Learned amicus curiae, appointed by this court and for whose assistance we are grateful, briefs only one issue as ground for reversal. It is that the principle of the *White* and related cases does not place the privilege beyond the reach of Mr. Shelton because the Klan organizations are a criminal conspiracy and for that reason the rule of those cases does not apply. Mr. Shelton understandably has not tendered in support of his claim of the privilege, and there has not been litigated, the issue whether the Klan organizations are a criminal conspiracy. We cannot recognize the privilege as properly invoked by assuming on the record before us that they are. Whether they have taken corporate or other form the Klans are separate organizational entities, not simply individuals engaged in joint activities. We are aware that the preliminary investigation of the Committee, as we have pointed out, as well as publications about the Klans, lay criminal activities at their doors and attribute such activities to their members. But we are not aware of any criminal laws applicable to the Klans as organizations or to their members because of membership, as distinct from criminal laws applicable to such conduct as they and anyone else may engage in. The principles of the deci-

sions thus far rendered, therefore, do not place the privilege of the Fifth Amendment in the hands of Mr. Shelton with respect to the organizations' records. For example, in each of the *Wilson, White,* and *Curcio* cases, all *supra,* a grand jury was investigating alleged criminal activity which the records sought might have brought home to their custodian who was required by the subpoena to produce them. Yet in each case the claim of the privilege, insofar as the records were concerned, was held unavailable to preclude their production by the custodian. Production by Mr. Shelton of incriminating Klan records would not be self-incrimination, but "corporate" or "organizational" incrimination. See Fineberg v. United States, 393 F.2d 417, 420 (9th Cir.).

For reasons similar to those discussed above we do not apply to this case our decision in Communist Party of United States, v. United States, 127 U.S.App. D.C. 389, 384 F.2d 957. The organization's claim of the privilege was there upheld because the filing of the registration statements ordered by the Subversive Activities Control Board would (1) have exposed all persons on the list required to be filed to prosecution under existing criminal laws and (2) have caused individuals to take action which in itself would incriminate them under those laws. The court pointed out:

> For appellant [the organization] to file a list of its members exposes every person on that list to a serious and substantial "threat of prosecution." The only people with the authority and capacity to compile an authentic such list and to authorize its use for registration purposes would, by that very act, subject themselves to a like threat.

127 U.S.App.D.C. at 399, 384 F.2d at 967. And see Albertson v. Subversive Activities Control Board, 382 U.S. 70, 86 S.Ct. 194, 15 L.Ed.2d 165. There the privilege was invoked by individuals who would be required to take action which itself would incriminate them. Neither *Albertson* nor our *Communist*

*Party Case* involved a demand for organization records from one who, as Mr. Shelton, possessed them in a representative capacity. Each called for the initiation of individually incriminating conduct in an area permeated with statutory criminal law. The production by Mr. Shelton of records of the Klans, in contrast, would not be an incriminating act in itself; and, as we have seen, the fact that the records in his control in a representative capacity might incriminate him does not place the privilege at his disposal to excuse their production.

Two contentions of Mr. Shelton first advanced at trial are now considered:

■ 1. Appellant issued a subpoena *duces tecum* upon Representative Willis for production of all information concerning the Klan in his possession, custody, control, or maintained by or available to him or obtained by him prior to or during the investigation and hearings commencing in October, 1965. On the Government's motion this subpoena was quashed. The Government relies on Bowman Dairy Co. v. United States, 341 U.S. 214, 71 S.Ct. 675, 95 L.Ed. 879, interpreting Rule 17(c), Fed.R. Crim.P. The authority for issuance of such a subpoena under the Rule is qualified by its provision that the court may quash the subpoena "if compliance would be unreasonable or oppressive." In support of its motion to quash the government filed a rather full memorandum, pointing to the conclusion that compliance "would be both unreasonable and oppressive since it would produce no admissible evidence while forcing the Committee to produce a large volume of inadmissible confidential material." No effort was made by Mr. Shelton to meet these objections. In this court his brief on the subject is confined to the following:

In Bowman Dairy Co. v. U. S., 311 [sic] U.S. 214, the Court in substance stated that the defendant has a right to subpoena all material in the Government's possession which would be admissible in evidence. Therefore the Appellant contends that if he had been permitted to obtain the material sought as described, he would have been able to properly prepare his defense. The Appellant contends that to deny him this right is in violation of the "due process" clause of the Constitution.

Mr. Shelton does not present a case of abuse of discretion by the court in quashing the subpoena.

■ 2. The brief also refers to the "denial of the opportunity to produce a witness, namely the Chairman of the Committee," which was made the basis for a motion in the District Court for a continuance, "based upon the illness of a material witness." The motion was filed the day of trial and was denied. The witness was Mr. Willis, upon whom the subpoena *duces tecum* above referred to and a subpoena *ad testificandum* had been served. We do not know on what appellant bases his statement that Mr. Willis was a material witness. Nothing whatever was offered to that effect, and no prejudice appears from the refusal of the court to grant the continuance. See United States v. Woodard, 376 F.2d 136, 143 (7th Cir.).

■ In addition to the foregoing, Mr. Shelton also contends that he was never found guilty of the crime charged since "the Court records reflect that one JOHN M. SHELTON was found guilty of contempt of Congress." It is true that the Clerk's Certificate recording the guilty verdict is styled "United States vs. John M. Shelton." However, every other reference in the record is to Robert M. Shelton, including both the judgment and commitment signed by the trial judge. Moreover, the appellant did not object to this clerical error at the time of his sentencing, one month after the Clerk's Certificate was filed,

or at any other time prior to the filing of his brief in this court. We cannot reverse on the basis of this clerical mistake which entails no prejudice to Mr. Shelton.[22]

Affirmed.

## APPENDIX

Received
Oct 11 9 29 AM '65
U. S. MARSHAL
BIRMINGHAM, ALA.

Copy

United States of America
CONGRESS OF THE UNITED STATES

To _____ Robert M. Shelton _____

_____, Greeting:

PURSUANT to lawful authority, YOU ARE HEREBY COMMAND-ED to be and appear before the Committee on Un-American Activities of the House of Representatives of the United States, or a duly appoint-ed subcommittee thereof, on October 19, 1965 at ten o'clock, a. m., at their Committee Room, 226 Cannon House Office Building, Washing-ton, D. C., then and there to testify touching matters of inquiry com-mitted to said committee, and not to depart without leave of said com-mittee.

YOU ARE HEREBY COMMANDED to bring with you and pro-duce before said committee, or a duly authorized subcommittee thereof, the following:

Items called for on the attached document which is made a part of this subpoena

HEREOF FAIL NOT, as you will answer your default under the pains and penalties in such cases made and provided.

To Louis J. Russell /U. S. Marshal, to serve and return.

GIVEN under my hand this 7th day of October, in the year of our Lord, 1965.

/S/ E. E. Willis

Chairman—Chairman of Subcommittee— Member Designate of the Committee on Un-American Activities of the House of Representatives.

———◆———

If you desire a conference with a rep-resentative of the Committee prior to the date of the hearing, please call or write to: Staff Director, Committee on Un-American Activities, Washington 25, D. C., Telephone: CApitol 4–3121—Ext. 3051.

*Attachment to Subpoena to Robert M. Shelton, dated October 7, 1965*

(1) All books, records, documents, corre-spondence, and memoranda relating to the organization of and the con-duct of business and affairs of the Invisible Empire, United Klans,

22. While these issues are not presented, I join the concurring opinion in disavow-ing (1) any inference which might be drawn from our opinion to the effect that timely objection to the production of membership lists would not have pro-tected them from disclosure, and (2) any implication that the House Commit-tee on Un-American Activities has the power to subpoena the membership lists of political organizations.

Knights of the Ku Klux Klan of America, Inc., also known as the United Klans of America, Inc., Knights of the Ku Klux Klan, and affiliated organizations, namely, the Alabama Rescue Service, United Klansmen of America, Whiteman's Defense Fund, Christian News Service, in your possession, custody or control, or maintained by or available to you as Imperial Wizard of the Invisible Empire, United Klans, Knights of the Ku Klux Klan of America, Inc. also known as the United Klans of America, Inc., Knights of the Ku Klux Klan.

(2) All books, records, documents, correspondence, and memoranda in your possession, custody or control, or maintained by or available to you, in your capacity as Imperial Wizard of the United Klans of America, Inc., Knights of the Ku Klux Klan, which the "Constitution and Laws" of said organization authorize and require to be maintained by you and any other officer of said organization, the same being in your possession, custody or control.

(3) Copies of unexecuted forms relating to applications for membership, application and issuance of charters; copies of Constitutions and By-Laws; manuals; and unexecuted forms and documents used by Kligrapps (Imperial, Realm and Klan or Klavern), and Klabees, (Imperial, Realm and Klan or Klavern), Grand Dragons (Realm), Kleagles (Imperial, Realm, Province, and Klan or Klavern); all of which are in your possession, custody or control, or available to you as Imperial Wizard of the Invisible Empire, United Klans, Knights of the Ku Klux Klan of America, Inc., also known as the United Klans of America, Inc., Knights of the Ku Klux Klan, and its affiliated organizations, the Alabama Rescue Service and United Klansmen of America, and which are used in connection

with the business and affairs of said organizations.

(4) Copies of U.S. Treasury Department, Internal Revenue Service, Form 1120, "U. S. Corporation Income Tax Return", for the fiscal years 1961 through June 30, 1965, filed by you as President and/or Imperial Wizard, United Klans of America, Knights of the Ku Klux Klan, Inc., with the U.S. Treasury Department, Internal Revenue Service.

(5) Copies of U.S. Treasury Department, Internal Revenue Service, Form 1040, "U. S. Individual Income Tax Return", for the calendar years 1958 through 1964, filed by you as an individual taxpayer with the U.S. Treasury Department, Internal Revenue Service.

J. SKELLY WRIGHT, Circuit Judge, with whom Chief Judge BAZELON joins, concurring: I join the court's opinion in this case with the following reservations.

On the Fifth Amendment question, I agree with the court that our decision in Communist Party of United States v. United States, 127 U.S.App.D.C. 389, 384 F.2d 957 (1967), does not shield Mr. Shelton against an order to produce the records of his Klan organizations. Production of Communist Party records or registration on behalf of that organization amounts to an admission of a leadership role, or at very least membership, in the Party. Under federal law, such leadership or membership may in itself be a crime. 127 U.S.App.D.C. at 393, 384 F.2d at 961. No such direct criminal liability attaches to leadership or membership roles in the Ku Klux Klan. On this basis, I join in rejection of Mr. Shelton's Fifth Amendment claim.

Mr. Shelton has argued at trial and on appeal that the First Amendment freedom of association forbade the Committee to compel him to produce Klan membership lists. I agree with the court that this claim cannot support reversal

of his contempt conviction, but on the sole basis that Mr. Shelton failed to raise this contention by timely objection to the Committee.

Mr. Shelton was subpoenaed in the most general terms to produce before the Committee "all books, records, documents, correspondence, and memoranda relating to the organization of and the conduct of business and affairs of" his Klan organizations. Nothing in the language of this subpoena, or in the House Resolution authorizing the investigation, the debates surrounding that Resolution, or the statement of the Chairman opening the hearing at which the documents were to be produced, compels the inference that the Committee sought, or was authorized to seek, disclosure of protected membership lists.

In his refusal to submit to the subpoena, Mr. Shelton did not object in particular terms to producing such lists; rather he gave a blanket refusal to produce any records of his organizations. Nor did the grounds offered for his refusal give the Committee any clear indication that he objected to producing membership lists. His brief reference to the First Amendment as a ground for refusal could as easily have been taken as a restatement of the familiar general objection on free speech grounds to the Committee's investigations of "un-American" ideas and activities. *See* Barenblatt v. United States, 360 U.S. 109, 140, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959) (dissenting opinion of Mr. Justice Black).

If Mr. Shelton's refusal to produce the subpoenaed records was based on his belief that the subpoena required production of protected membership lists, he should have made that claim clear to the Committee. The Committee could then have given him oral assurance that it was not seeking the membership lists, or it could even have amended the subpoena explicitly to exclude them. As it was, the Committee was denied access to records

it had a right to see on the basis of an unarticulated claim that a few other records, which it may never have intended to subpoena, were privileged from disclosure.

The subsequent debate in the House on the contempt citation against Mr. Shelton emphasizes the tenuous nature of his position on this appeal. In that debate, several Congressmen suggested the possibility that one reason why Mr. Shelton did not obey the subpoena was a desire to protect the membership lists from disclosure. In response the Chairman of the Committee, Mr. Willis, asserted that the Committee had never expected to see Klan membership lists, for prior investigation had revealed that the Klan maintained no such lists.[1]

As the Supreme Court held in United States v. Bryan, 339 U.S. 323, 332, 70 S.Ct. 724, 94 L.Ed. 884 (1950), a contempt case in many ways similar to this one, if a witness has "legitimate reasons for failing to produce the records of the association, a decent respect for the House of Representatives, by whose authority the subpoenas issued, would have required that she state her reasons for noncompliance upon the return of the writ." In that case, the defendant objected at trial for the first time that a quorum of the Committee had not been present at the hearing at which she refused to comply with the subpoena. It was held that the objection should have come when the supposed defect could have been corrected—at the hearing itself. That decision controls this case.

While joining the affirmance of Mr. Shelton's conviction on the basis of *Bryan,* I would disavow any inference which might be drawn from the court's opinion to the effect that timely objection to production of the membership lists would not have protected them from disclosure. Starting with N. A. A. C. P. v. State of Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), the Supreme Court has placed the protection of the First

---

1. *See* 112 CONG.REC. 1754–1762 (1966) (remarks of Congressmen Edwards, Conyers, Burton, Ryan and Willis).

Amendment around the membership lists of unpopular political associations. The early cases in this line, N. A. A. C. P. v. State of Alabama, *supra*, and Bates v. City of Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1966), offered such protection where the governmental interest in disclosure does not offset First Amendment considerations. And in State of Louisiana ex rel. Gremillion v. N. A. A. C. P., 366 U.S. 293, 296, 81 S.Ct. 1333, 1335, 6 L.Ed.2d 301 (1961), the Court flatly held that "where it is shown * * * that disclosure of membership lists results in reprisals against and hostility to the members, disclosure is not required."

The two cases in which the Supreme Court has allowed compulsory disclosure of membership lists are very different from this one. In People of State of New York ex rel. Bryant v. Zimmerman, 278 U.S. 63, 49 S.Ct. 61, 73 L.Ed. 184 (1928), the Court upheld the enforcement against the Ku Klux Klan of a New York statute requiring oath-bound organizations, other than labor unions and benevolent societies, to disclose their membership lists. And in Communist Party of United States v. Subversive Activities Control Board, 367 U.S. 1, 89–103, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961), the Court rejected a First Amendment challenge to Section 7 of the Internal Security Act of 1950, which required "Communist action organizations" to register and disclose their memberships. In both of these cases, production of membership lists was compelled by statutes enacted by the plenary legislature, presumably after careful investigation of the facts and mature deliberation of the competing factors involved in disclosure.[2] To permit similar disclosure during the preliminary process of unearthing the information needed to support such legislation would involve a circular undermining of the constitutional freedom of association.[3]

The Supreme Court has clearly warned of the danger that legislative committees may "expose for the sake of exposure," Watkins v. United States, 354 U.S. 178, 200, 77 S.Ct. 1173, 1185, 1 L.Ed.2d 1273 (1967), yet few objects of investigation are more useful for purposes of exposure and punishment, while having less relevance as a factual background for legislative deliberation, than the membership lists of unpopular groups.

For these reasons, I would disavow any implication that the House Committee on Un-American Activities has the power to subpoena the membership lists of political organizations.

2. *See* Communist Party of United States v. Subversive Activities Control Board, 367 U.S. 1, 93–94, 81 S.Ct. 1357, 6 L.Ed. 2d 625 (1961).

3. Gibson v. Florida Legislative Investigation Committee, 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963), is not contrary. In that case, which involved an attempt by a legislative committee to expose the membership lists of the N.A.A.C.P., the Court was able to protect the lists from disclosure on the relatively narrow ground that the state had failed to show "a substantial relation between the information sought and a subject of overriding and compelling state interest." *Id.* at 546, 83 S.Ct. at 894. Thus the Court made no holding on the question of how the balance would have been struck between the state's interest in disclosure and the group's freedom of association if such a relation had been shown.