Peter J. Camiel, Chairman, Democratic County Executive Committee of Philadelphia County, Petitioner, *v.* Select Committee on State Contract Practices of the House of Representatives, Respondent.

Argued June 6, 1974, before President Judge Bow-MAN and Judges KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT. Judge CRUMLISH, JR. did not participate.

*Morris Gerber*, with him *Marc D. Jonas*, for petitioner.

*Edward Friedman,* with him *Matthew F. Coppolino, Frederick L. Voigt, Stephen F. Freind, John Michael Willmann* and *Jane A. M. Laffey,* for respondent.

OPINION BY JUDGE KRAMER, July 30, 1974:

This case was filed under the original jurisdiction of this Court as provided in Section 401(a) of the Appellate Court Jurisdiction Act, Act of July 31, 1970, P. L. 673, 17 P.S. §211.401(a). It was commenced on May 28, 1974 by the filing of a petition by Peter J. Camiel, Chairman of the Democratic County Executive Committee of Philadelphia County (Camiel) to quash a subpoena duces tecum served on Camiel by the Select Committee on State Contract Practices of the House of Representatives (Select Committee). The Select Committee answered the petition and because of the apparent urgency, the matter was specially set down for argument on June 6, 1974. The material facts are not in dispute and disclose the following history and events generating the dispute before us.[1]

By House Resolution 98, Pr. No. 1381, adopted July 25, 1973, the House of Representatives of the General Assembly of the Commonwealth directed a Select Committee of the House, consisting of seven members to be appointed by the Speaker, including three members of the minority party to ". . . examine, investigate and make a complete study for the purpose of informing the House of Representatives in the discharge of its constitutional legislative functions and duties of any and

---

[1] Several days after filing the above petition, Peter J. Camiel, in the same capacity, also filed a complaint in equity raising the same issues and seeking similar relief. (*Camiel v. Select Committee,* No. 706 C. D. 1974, complaint filed May 29, 1974.) Apparently this action was taken as a precautionary measure in the event that an issue was raised as to the use of a petition as an original pleading and its service as original process. *Cf. In Re: Crime Commission's Subpoena Enforcement Petition,* 2 Pa. Commonwealth Ct. 650 (1971), *aff'd,* 446 Pa. 152, 285 A. 2d 494 (1971).

all matters pertaining to: (1) the administration, activities, methods of operations, use of appropriations, use of funds and expenditures thereof, policies, accomplishments and results, deficiencies or failures, eff[i]ciency and effectiveness of State agencies responsible for the purchasing, leasing, construction, and disposal of Commonwealth supplies, properties and services; and (2) individuals, corporations, consultants, advisors, authorities and entities within or outside the Commonwealth, related to, involved in, or affecting the purchasing, leasing, construction and disposal of Commonwealth property, supplies and services . . . ."

In furtherance of its purposes, it was authorized to issue subpoenas ad testificandum and duces tecum touching matters properly being inquired into by the Select Committee subject to penalties provided by law for failure to comply, and was directed to report its findings together with its recommendations for remedial legislation or other appropriate action at the earliest practicable date.

At a meeting of the Select Committee held on May 14, 1974, subpoenas duces tecum were authorized and directed to be served upon the custodian of records of Republican and Democratic County Committees of twelve counties: Philadelphia, Montgomery, Delaware, Erie, Lycoming, Green, Fayette, Cambria, Dauphin, Allegheny, Westmoreland and Mercer.

Camiel was served with such a subpoena (dated May 14, 1974) and thereafter initiated these proceedings. This subpoena duces tecum, and apparently all such subpoenas issued, called upon the custodian of the records of the respective county political parties to produce at a designated time and place "books, documents, accounts, records, indices, tapes, logs, ledgers and any and all other data pertaining to:

"(a) all contributions received on or after January 1, 1966 through May 13, 1974, including but not limited

to, any monies, goods, services, or any other thing or things of value by the Democratic County Executive Committee of Phila. County or any other committee, group, or person operating under the authority of the aforementioned committee;

"(b) the name, and address of each of said contributors. The date, amount, and method of payment (cash, check, money order, etc.);

"(c) sale of tickets by the aforementioned committee or by any other committee, group or person operating under the authority of the aforementioned committee from January 1, 1966 through May 13, 1974, including but not limited to, dinners, luncheons, breakfasts, or roasts, or any other event sponsored by the aforementioned committee;

"(d) sale of advertisements for banquet advertising books, almanacs and any other publications produced under the authority of the aforementioned committee from January 1, 1966 through May 13, 1974;

"((c) and (d) above shall not apply to tickets or advertisements sold for events to take place on or subsequent to May 13, 1974.)"

As is wont in the legal fashion of the day, those who believe themselves to be aggrieved by governmental action seek protection under judicially declared constitutional rights citing a host of decisions as supporting their position which are countered by an equally imposing citation of decisions seemingly of an opposite view. This is both predictable and understandable for want of precision of decisional law in this field, and because of an incomprehensible reluctance of courts to declare prior decisional law overruled when a more recent decision of the same court is irreconcilable with a prior pronouncement.

This case is no exception and there have been posed several independent issues, each of which involves an asserted constitutional right or rights in Camiel sup-

ported by decisional authority, but countered by equally impressive decisional authority which respondent asserts takes petitioner out of the protection he claims.

Camiel has presented to us three issues which we believe can be fairly summarized as follows: Should a subpoena duces tecum issued by a Select Committee on State Contract Practices of the House of Representatives directed to the Custodian of Records of the Democratic County Executive Committee of Philadelphia County be quashed (a) because the supportive House resolution is so broad, vague and indefinite as to render it unconstitutional and action taken pursuant thereto null and void, or (b) for want of a nexus between the information sought and the subject of the authorized investigation, or (c) because of arbitrary selection of persons or bodies against whom such subpoenas have issued, thereby producing invidious discrimination violative of due process and equal protection?

Although Camiel has raised real issues which may some day have to be decided by the courts, our review of the record before us and our legal research leads us to the conclusion that this case does not yet present a justiciable issue and therefore is not ripe for a decision on the merits.

Preliminarily we have grave reservations concerning the jurisdiction of this Court to entertain a petition to quash a subpoena issued by a Select Committee of the House of Representatives of our General Assembly before a citizen's constitutional rights are actually affected. We view this point to be of a very serious nature. If there is any one principle of constitutional law which supports and protects our form of government, including all of our constitutional rights, it is the separation of powers among the three branches of government. Every crack in this foundation weakens the entire structure.

We are here faced with action by the House of Representatives. No question has been raised concerning the authority of the House of Representatives to establish this Select Committee. No question can be raised concerning the power of the House of Representatives to subpoena witnesses and evidence for legislative purposes. We find a distinction between this case and *Pennsylvania Crime Commission v. Nacrelli,* 5 Pa. Commonwealth Ct. 551 (1972), for here we are dealing with the Legislature itself, and in *Nacrelli* we had before us a commission, i.e., a separate entity, which brought legal action under specific statutory authority. We are asked here to interfere with the legislative process, and we believe we must question whether we have the jurisdiction and the power to interfere at this point in the proceedings.

Under the facts of this case, the Select Committee has served a subpoena duces tecum on Camiel, but there has been no confrontation. The subpoena could be withdrawn before any hearing, as actually happened in a case filed with this Court shortly after the one now before us. (*See Steve Javor v. Select Committee On State Contract Practices of the House of Representatives,* No. 810 C.D. 1974). At this point, we do not know whether the Select Committee may be willing to accept those records which Camiel and the Democratic County Executive Committee of Philadelphia may be willing to submit. At a confrontation, the Select Committee could decide not to force the issue or even to seek a contempt citation. Camiel may raise constitutional questions there, on which the Select Committee may rule in his favor, thereby eliminating any problems. The point is that the case is not ripe for determination.

If all the Select Committee desires are those records which Camiel and the organization he represents are under a legal obligation to file, the Select Committee may be satisfied by the submission of, or reference to, the records already filed. If the Select Committee is

seeking records for which there is no present statutory requirement for disclosure, then perhaps an issue will be raised upon the failure to produce such material; in which case, at that point in time, a Court may be called upon to determine the issue. Courts should not interfere with the investigatory powers of the Legislature necessary to carry out its legislative function until some citizen's constitutional rights are affected and asserted as a reason for noncompliance or refusal to honor a legislative subpoena.

As was held in *Annenberg v. Roberts*, 333 Pa. 203, 2 A. 2d 612 (1938), a court sitting in equity may restrain public officers to protect a citizen's constitutional rights after service of a subpoena and before a confrontation; but the action before us is not in equity. Furthermore, *Nacrelli, supra,* cannot be used to support jurisdiction in the action before us because there there was specific statutory authority, and in addition, a confrontation had occurred.

Even as this opinion is being written, there is pending before the United States Supreme Court a monumental historical constitutional case involving yet another question of the power to subpoena material evidence. That case is *United States v. Richard M. Nixon* (No. 73-1766). The record facts of that case (and its countersuit) disclose that even the President of the United States, by his counsel, made a special appearance before the body issuing the subpoena (there a U. S. District Court) to present his defenses to and motions on the subpoena. In the *Nixon* case, the President offered some but not all the subpoenaed material, and the Special Prosecutor, not being satisfied, forced the issue. The point for that case, as well as this case, being that the issues are not struck until there is a confrontation.[2]

---

[2] Subsequent to the preparation of this opinion and its circulation among the Judges of this Court, the United States Supreme

Our research shows that although legislative investigations have been with us from the very beginning of the Republic, extensive United States Supreme Court opinions delineating the permissible scope of such investigations are of rather recent vintage.[3] In *Kilbourn v. Thompson,* 103 U.S. 168 (1881), which was the first really important decision on congressional investigations, the Court established the principle that the Legislature could not inquire into the private affairs of citizens if the investigation could result in no valid legislation on the subject to which the inquiry referred. In *McGrain v. Daugherty,* 273 U.S. 135 (1927), the Court stated that the power of inquiry is an essential and appropriate auxiliary to the legislative function and therefore, the Legislature could obtain information needed to exercise its legislative function by compelling a private individual to appear before it or one of its committees. In *Sinclair v. United States,* 279 U.S. 263 (1929), the Court, while recognizing that Congress is without authority to compel disclosures for the sole purpose of aiding the prosecution of pending suits, stated that the Legislature can require pertinent disclosures in aid of its own constitutional powers even if the information sought may be of use in a pending suit. Later in *Watkins v. United States,* 354 U.S. 178 (1957), Watkins' conviction of contempt of Congress was reversed by the United States Supreme Court basically for the reason that he was not afforded a fair opportunity to determine whether he was within his rights in refusing to answer, and that such witnesses called before legislative committees were entitled to all of their due process constitutional rights that they might otherwise have in

Court, on July 24, 1974, handed down its opinion in the *Nixon* cases. We have reviewed the *Nixon* opinion and conclude that it lends support to the position of the majority set forth in this opinion.

[3] For an interesting study, *see* Taylor, Grant Inquest—The Story of Congressional Investigations (1955).

a criminal action. In *Watkins, supra,* the Court issued its first admonishment against the "vice of vagueness." Interestingly, the Court said in *Watkins, supra,*

". . . The power of congress to conduct investigations is inherent in the legislative process. . . . But, broad as is this power of inquiry, it is not unlimited. There is no general authority to expose the private affairs of individuals without justification in terms of the functions of the Congress. . . . Nor is the Congress a law enforcement or trial agency. These are functions of the executive and judicial departments of government. No inquiry is an end in itself; it must be related to, and in furtherance of, a legitimate task of the Congress. Investigations conducted solely for the personal aggrandizement of the investigator or to 'punish' those investigated are indefensible.

"It is unquestionably the duty of all citizens to cooperate with the Congress in its efforts to obtain the facts needed for intelligent legislative action. . . . This, of course, assumes that the constitutional rights of witnesses will be respected by the Congress as they are in a court of justice." 354 U.S. at 187-188.

"We have no doubt there is no congressional power to expose for the sake of exposure. The public is, of course, entitled to be informed concerning the workings of its government. That cannot be inflated into a general power to expose where the predominant result can only be an invasion of the private rights of individuals. But a solution to our problem is not to be found in testing the motives of the committee members for this purpose. Such is not our function. Their motives alone would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose is being served." 354 U.S. at 200.

"It is the responsibility of the Congress, in the first instance, to insure that compulsory process is used only in furtherance of a legislative purpose. That requires

that the instructions to an investigating committee spell out that group's jurisdiction and the purpose with sufficient particularity." 354 U.S. at 201.

"An excessively broad charter, like that of the House Un-American Activities Committee, places the courts in an untenable position if they are to strike a balance between the public need for a particular interrogation and the right of citizens to carry on their affairs free from unnecessary governmental interference." 354 U.S. at 205-206.

In *Sweezy v. New Hampshire*, 354 U.S. 234 (1957), decided on the same day as *Watkins, supra,* the Court again reversed a conviction for contempt for refusing to answer the questions of a *state* attorney general authorized by a state legislature to investigate subversive activities. In *Sweezy*, the Supreme Court had determined that the questions asked by the attorney general were not wholly related to the object of the Legislature in authorizing the inquiry. In a concurring opinion, Justice FRANKFURTER relied upon the balancing principle. He stated: "[T]he inviolability of privacy belonging to a citizen's political loyalties has so overwhelming an importance to the well-being of our kind of society that it cannot be constitutionally encroached upon on the basis of so meagre a countervailing interest of the State as may be argumentatively found in the remote, shadowy threat to the security of New Hampshire allegedly presented in the origins and contributing elements of the Progressive Party and in petitioner's relations to these." 354 U.S. at 265.

In *Barenblatt v. United States,* 360 U.S. 109 (1959), the Court stated:

"Broad as it is, the power [to investigate] is not, however, without limitations. . . . And the Congress, in common with all branches of the Government, must exercise its powers subject to the limitations placed by the Constitution on governmental action, more particu-

larly in the context of this case the relevant limitations of the Bill of Rights." 360 U.S. at 111-112.

"Undeniably, the First Amendment in some circumstances protects an individual from being compelled to disclose his associational relationships. . . . Where First Amendment rights are asserted to bar governmental interrogation resolution of the issue always involves a balancing by the courts of the competing private and public interests at stake in the particular circumstances shown." 360 U.S. at 126.

"So long as Congress acts in pursuance of its constitutional power, the Judiciary lacks authority to intervene on the basis of the motives which spurred the exercise of that power." 360 U.S. at 132.

The Court concluded that on balance the governmental interests involved outweighed the individual interests and therefore the provisions of the First Amendment had not been offended. On the same day that it decided *Barenblatt, supra,* the Court handed down *Uphaus v. Wyman,* 360 U.S. 72 (1959), which was also a state-related case involving New Hampshire. This time the majority affirmed the civil contempt order and rejected the constitutional argument presented. The majority in *Uphaus, supra,* found a nexus between the organization, which the witness represented as the executive director, and subversive activities, and therefore held that the inquiry involved in the case was sufficiently relevant to support the attorney general's action. Certainly in the case before us no one has contended that the organization, per se, was involved in any wrongdoing. In both *Uphaus, supra,* and *Barenblatt, supra,* there were strong dissents written by several Justices to the effect that the legislatively authorized investigation involved was "exposure purely for the sake of exposure" and therefore, unconstitutional.

In *Gibson v. Florida Legislative Investigation Committee,* 372 U.S. 539 (1963), we find a legislative com-

mittee of the State of Florida, organized to investigate the infiltration of Communists into various organizations, investigating the Miami branch of the National Association for the Advancement of Colored People (NAACP). The president of the NAACP, among other things, was ordered to bring with him records of the association showing the identity of its members and contributors, which he refused to do. The Court reversed the conviction for contempt because the legislative inquiry violated the constitutional protections afforded by the First and Fourteenth Amendments pertaining to the rights of association. Interestingly the majority in *Gibson, supra,* said:

"The fact that governmental interest was deemed compelling in Barenblatt . . . and held to support the inquiries there made into membership in the Communist Party does not resolve the issues here, where the challenged questions go to membership in an admittedly lawful organization." 372 U.S. at 549.

"While, of course, all legitimate organizations are the beneficiaries of these protections, they are all the more essential here, where the challenged privacy is that of persons espousing beliefs already unpopular with their neighbors and the deterrent and 'chilling' effect on the free exercise of constitutionally enshrined rights of free speech, expression, and association is consequently the more immediate and substantial." 372 U.S. at 556-557.

In *DeGregory v. Attorney General of New Hampshire,* 383 U.S. 825 (1966), the Court again reversed a conviction for contempt for refusal to answer questions relating to Communist activities prior to 1957. Once again, the United States Supreme Court leveled its admonition that legislative investigation should not be carried out for exposure's sake alone. It stated: "There is no showing of 'overriding and compelling state interest' . . . that would warrant intrusion into

the realm of political and associational privacy protected by the First Amendment." (Citation omitted.) 383 U.S. at 829. The case, however, really turned on the point that the information being sought was historical rather than current and therefore, not relevant.

Our purpose in referring to all of these cases is to highlight the point that the United States Supreme Court was rendering decisions on ripe cases presenting concrete issues concerning the effect of legislative action on citizens' constitutional rights. To be sure, from these cases we learn (a) that the legislative authority cannot be so broad as to negate any legitimate legislative purpose, (b) that the subpoena or questions asked cannot be so vague as to deprive the witness of constitutional due process, (c) that the inquiry cannot be so historical as to not be relevant to a current legislative intent, (d) that even though the witness subpoenaed may be an executive of the organization whose records are sought, the members of the organization may have constitutional rights which are to be protected, and (e) that citizens have the First Amendment constitutional rights to privacy and to association in legitimate organizations, which may not be denegated by the chilling effect of exposure to legislative investigation, unless on balance the state interest is determined by the courts to be of heavier weight.

Our reading of the cases leads us to believe that the balancing of which the United States Supreme Court talks is one of an ad hoc nature. Under similar facts, the Court held in *Gibson, supra* (involving the NAACP), that the governmental interest involved did not outweigh the individual's right of association; however in *Barenblatt, supra* (involving the Communist Party), the governmental interest was held to outweigh the individual's interest. *Cf. People of State of New York, ex rel. Bryant v. Zimmerman,* 278 U.S. 63 (1928)

and *Shelton v. United States,* 404 F. 2d 1292 (D.C. Cir. 1969), *cert. denied,* 393 U.S. 1024 (1969).

The inquiry which the Select Committee has been directed and authorized to conduct is, as demonstrated by the resolution, related to matters clearly within the legislative power regulating State contracts, and of particular concern not only to it but to the people of the Commonwealth as expressed in Article III, Section 22, of the Pennsylvania Constitution of 1968. Our reading of the cases permits us to conclude that there is no constitutional impediment per se to a broadly authorized and wide-ranging legislative inquiry so long as the inquiry is to develop information consistent with the exercise of the legislative power; but a constitutional issue may be raised by a citizen at that point in the proceedings when his or her constitutional rights are affected, which may be declared a constitutional impediment through a court decision.

As the House Committee points out in its brief, anyone who has followed the recent developments in the Nation's capital has to be saddened by the immoral conduct of people in high places in government and in the operations of the independent (i.e., independent of the official Republican Party) organization known as The Committee to Reelect The President. If ever there was a need for reform in the election laws and the establishment of standards for persons who are with governmental authority, it is now. But no matter what the urgency may be, paramount in all of our considerations in any of these cases are the constitutional rights of our citizens. For example, it is entirely conceivable that employes of some corporation, which is the political antithesis of this petitioner, might be fearful of unwarranted ridicule, or for their employment and livelihood, if it became known to their employer that they were contributing to the Democratic Party of Philadelphia. If exposure through a legislative investigation

would jeopardize the employment rights of citizens, or effectively prevent them from joining or supporting the political party of their choice, then it may be that, on balance, their constitutional right of association would outweigh the State interest involved.

Our review of this scant record leads us to believe that we do not have sufficient information from which we can make a final determination of whether all the records sought in the subject subpoena should be permitted or denied.

In summary, it is our holding that the matter is not ripe for a final judicial determination, on the merits, of the constitutional issues which may or may not be involved. Courts should not decide a citizen's constitutional rights in a vacuum. We reiterate, we do not know what material, if any, the petitioner may be willing to submit, or what the Select Committee may be willing to accept. Even assuming the petitioner will refuse to submit any of the material subpoenaed, we do not know whether the Select Committee will force an issue, for that is certainly within its discretion. Absent a confrontation and a record made showing the factual posture of the matter, it is our position that it is improper for this Court to dispose of all the potential constitutional issues which might be raised in this case. Obviously, then, we are not ruling on the merits of the case in any manner. As a result, we will dismiss the petition, but clearly without prejudice, so as to permit the petitioner to commence an action after definitive issues are struck, if he so desires.

### Order

And Now, this 30th day of July, 1974, the petition of Peter J. Camiel, Chairman, Democratic County Executive Committee of Philadelphia County to quash the subpoena duces tecum in question is hereby dismissed without prejudice. Each party to pay own costs.

DISSENTING OPINION BY JUDGE WILKINSON:

I must respectfully dissent. I would make the Rule absolute without prejudice to the right of the Select Committee on State Contract Practices of the House of Representatives to issue a new subpoena for the requested data on either named individuals or entities that it has reason to believe were related to, involved in, or affecting the purchasing, leasing, construction or disposal of Commonwealth property or for data on the members of the above identified group that petitioner's records show were members of the group.

In its present form I believe the subpoena is overly broad. I believe that precedent, reason, and fair play require the subpoena to be limited to information on persons and entities that fall into those categories specifically delineated in House Resolution 98, Pr. No. 1381, adopted June 11, 1973. This resolution is much more restricted than was the authority of the Crime Commission in *Pennsylvania Crime Commission v. Nacrelli*, 5 Pa. Commonwealth Ct. 551 (1972).

It seems to me this case is controlled both as to its justiciability and on the merits by two cases of our Supreme Court. In *American Car and Foundry Co. v. Alexandria Water Co.*, 221 Pa. 529, 535, 70 A. 867, 869 (1908), when a subpoena for all books and records of a company was issued, the Court relieved the company from compliance until the subpoena was restricted to relevant entries. The Court said:

"Anything in the nature of a mere fishing expedition is not to be encouraged. Where the plaintiff will swear that some specific book contains material or important evidence, and sufficiently described and identifies what he wants, it is proper that he should have it produced. But this does not entitle him to have brought in a mass of books and papers in order that he may search them through to gather evidence. In 23 Am. & Eng. Ency. of Law (2d. ed.), 179, it is said: 'The courts

uniformly decline to grant an application for production and inspection where it is merely for the purpose of a fishing examination, as where it is made to discover whether or not there is evidence contained in the documents which will be useful to the applicant, or for the purpose of determining whether he has a cause of action, or a defense, or in anticipation of a defense, or to gratify curiosity.'

"And the fair and proper rule upon the subject is also set forth in 3 Wigmore on Evidence (1904), sec. 2200, where it is said: 'A peculiarity of the subpoena duces tecum is that in the nature of things it must specify with as much precision as is fair and feasible the particular documents desired, because the witness ought not to be required to bring what is not needed, and he cannot know what is needed unless he is informed beforehand.' "

In *Annenberg v. Roberts*, 333 Pa. 203, 214, 2 A. 2d 612, 618 (1938), the Court struck down subpoenas asking for all records and ruled that the request must be limited to those relevant to the inquiry.

"The subpoenas show on their face that they contemplate an unreasonable search and seizure. They violate the principle which we announced in American Car & Foundry Co. v. Alexandria Water Co., 221 Pa. 529, where we held that a subpoena duces tecum could not properly be issued to bring in a mass of books and papers in order that there might be a search through them to gather evidence. We, therefore, are of opinion that the subpoenas as issued commanding plaintiffs to produce before the commission the things therein set forth are void in that they do not show that the demands therein are germane to the inquiry authorized by the Governor's call. If the subpoenas were complete in that regard, a different question might be presented."

It is important to keep in mind that we are not addressing ourselves to the question of what the Legisla-

ture could authorize but what in fact it did authorize here. If there is a need for the Legislature to secure information on how political parties raise funds and from whom, then appropriate legislative action is needed to authorize it. By House Resolution 98, the Legislature saw fit to restrict this inquiry to a specific group having contact with purchasing, leasing, construction and disposal of Commonwealth property, supplies and services.

Judge BLATT joins in this dissent.